[This opinion has been published in Ohio Official Reports at 175 Ohio St.3d 82.]

THE STATE OF OHIO, APPELLEE, *v*. KNUFF, APPELLANT.

[Cite as *State v. Knuff*, 2024-Ohio-902.]

*Criminal law—Aggravated murders—Convictions and death sentences affirmed.*

(No. 2019-1323—Submitted May 2, 2023—Decided March 14, 2024.)

APPEAL from the Court of Common Pleas of Cuyahoga County,

No. CR-17-618285-A.

_____

DETERS, J.

{¶ 1} This is an appeal of right in a capital case. Thomas E. Knuff Jr. was convicted on two counts of aggravated murder with death specifications for killing John Mann and Regina Capobianco. We affirm his convictions and the imposition of the death sentences.

## I. BACKGROUND

### A. The Murders

{¶ 2} Knuff was scheduled to be released from prison on April 11, 2017, after serving a sentence of 15 and a half years. *See State v. Knuff*, 8th Dist. Cuyahoga No. 80971, 2002-Ohio-6049. A few days before April 11, Alicia Stoner, a former prison employee with whom Knuff had had a relationship while he was incarcerated, offered to pick him up upon his release. Knuff declined her offer, saying he had already arranged for a ride with "John and his old lady."

{¶ 3} Shortly after his release, Knuff began staying at Village Motel in Strongsville in a room paid for by Stoner. On May 10, Knuff told his parole officer, Marc Fisher, that he would sometimes visit Stoner at her house but that he was living at the motel. When Fisher went to the motel, however, he learned that the manager had not seen Knuff since May 5. When Fisher confronted Knuff about being dishonest regarding his living arrangements, Knuff told Fisher that he was

living with John Mann at 6209 Nelwood Road in Parma Heights. Fisher told Knuff to report to him the next day.

{¶ 4} That same day, May 10, Fisher spoke with Mann on the telephone. Mann told Fisher that he lived alone, was not under court-ordered supervision, and had no weapons or dangerous animals in his house, and he agreed to unannounced home visits and warrantless searches. So Fisher granted Knuff permission to stay with Mann, pending a home visit. Knuff reported to Fisher on May 11 as he had been instructed and received a sanction for being dishonest about his living arrangements.

{¶ 5} Contrary to Mann's statements to Fisher, Mann was not living alone when he allowed Knuff to move into his residence; Regina Capobianco also had been living at 6209 Nelwood Road, since 2016. The relationship between Knuff and Capobianco was a complicated one that predated Knuff's 2017 release from prison. In 2005, Capobianco began a lengthy pen-pal relationship with Knuff. Their relationship, which had developed into a romantic one, ended during Knuff's imprisonment because Capobianco had begun using his money to purchase drugs for herself. When Knuff moved into the house at 6209 Nelwood Road, Capobianco was still abusing drugs. She was also engaging in prostitution—sometimes at Mann's house. Residing with someone engaged in crimes such as drug use or prostitution could have resulted in progressive sanctions against Knuff. So, a conflict arose between Knuff and Capobianco, which came to a head on May 11.

{¶ 6} That night, around 8:00 p.m., Knuff sent a text message to Stoner requesting money for a room for that night, saying, "[W]e have to get Regina out [of the house] now." Stoner sent Knuff $80 through Western Union. From 8:19 p.m. on May 11 until the afternoon of May 12, Stoner repeatedly called and sent text messages to Knuff but received no response. She also called and sent text messages to Mann between 12:27 a.m. and 10:22 a.m. on May 12 but could not reach him.

{¶ 7} In the early afternoon of May 12, Knuff finally called Stoner, sounding panicky and upset. He told her that he needed her to come to him but that he couldn't explain why at the time. Stoner picked Knuff up at a bar.

{¶ 8} Once Knuff was in her car, Stoner saw that one of his fingers was bandaged. Knuff told her that drug dealers had come to Mann's house because Capobianco owed them money. He said the dealers beat Mann and took Mann's car. He explained that afterwards, a conversation between Mann and Capobianco escalated and that Capobianco stabbed Mann. Then, Knuff told Stoner, the situation between himself and Capobianco escalated and he stabbed Capobianco. Knuff claimed that his finger had been injured when he put up a hand to block Capobianco from stabbing him. He told Stoner that he remembered stabbing Capobianco and then blacking out; when he came to, he grabbed Mann's cellphone and bus pass and left the house. When Stoner urged Knuff to call an ambulance for Mann and Capobianco, Knuff responded, "No, they're dead."

{¶ 9} In addition to the story he told Stoner, Knuff gave a variety of explanations to different people regarding how he had injured his finger. He told one person that he had been involved in a car chase while driving his son's truck and had hurt his finger on the vehicle. To others, he explained that a group of men had jumped him in Cleveland and tried to stab him; he claimed to have been cut in the process of disarming these attackers. Other explanations included that he had been bitten by a dog, that he had cut his finger while trimming hedges, and that he had been injured in a fight with some men who had supposedly attacked Mann inside the Nelwood Road house.

{¶ 10} The latter story was one that he told his son Tommy. On the morning of May 13, Knuff called Tommy and asked to be picked up. Tommy picked him up from 6209 Nelwood Road. When Knuff got into the vehicle, Tommy asked him about the bandage on his hand. Knuff then told Tommy that there were two dead

people back at the house. When Tommy asked Knuff whether he was responsible for those deaths, Knuff answered that he was.

{¶ 11} Knuff told Tommy that he had been cleaning the basement at 6209 Nelwood Road and when he went upstairs, he found two men stabbing Mann. Knuff told Tommy that he had stepped into the fray and killed both of the men who had been attacking Mann. Knuff told Tommy that he wanted to chop off the men's fingers and throw them into a sewer and then chop the bodies up to get rid of them.

{¶ 12} Two days later, on May 15, Tommy drove Knuff to a store where Knuff bought super-strength glue for his injured finger and a box of large, plastic trash bags known as "contractor bags."

{¶ 13} The next day, Stoner gave Knuff a ride to another store where he bought two hacksaws and two blades and shoplifted an X-Acto knife. Knuff told Stoner that he was going to use the hacksaws to dismember the bodies.

{¶ 14} On May 17, Knuff took his son's white SUV without permission. That night, he broke into two Parma Heights businesses—Classic Hair Studio and Spa & Nails. He took a cash register from Classic Hair Studio and cash from Spa & Nails. Surveillance video from Classic Hair Studio showed him entering the business and driving away in a white SUV.

{¶ 15} On May 18, Ohio State Highway Patrol Sergeant Alan Dunbar responded to an alert about a man on a highway holding a gun to his head. Sergeant Dunbar found Knuff walking back and forth along the highway and heard him say, "Just kill me, I don't want to live anymore." Knuff did not have a gun, however. Sergeant Dunbar took him into custody without any issues. Knuff told Sergeant Dunbar that undercover police officers had been chasing him while he was driving his son's SUV and that he had crashed the SUV and abandoned it. Sergeant Dunbar observed that one of Knuff's index fingers was severely injured, and he called for an emergency medical transport. Knuff was taken to Medina General Hospital

where Sergeant Dunbar requested a psychiatric hold because Knuff had threatened self-harm.

{¶ 16} At the hospital, Knuff was seen by Dr. Michelle Beskid, an emergency-medicine physician. He told Dr. Beskid that he had injured his finger while being chased by people. However, he told a physician's assistant that he had been wounded defending himself when his girlfriend tried to stab him.

{¶ 17} Knuff was sent to Akron General Medical Center for a psychiatric evaluation and care for his injured finger. There, a nurse in the psychiatric unit interviewed him. Knuff told the nurse that the previous week, a prostitute had attacked and killed his roommate John with a knife in his home. Knuff told the nurse that when he tried to intervene, the prostitute attacked him, lacerating his left index finger and inflicting other cuts on his hand. Knuff told the nurse he had then killed the prostitute in self-defense. Knuff's finger was ultimately amputated.

{¶ 18} Meanwhile, Parma Heights Police Detective Adam Sloan was investigating Capobianco's disappearance. Toni Bender, Capobianco's sister, told him that Capobianco had been in communication with a recently released prisoner named Thomas Knuff Jr. Detective Sloan tried to locate Knuff, thinking that he might have information about Capobianco. During his investigation, Detective Sloan learned that Knuff had missed a scheduled court date and that there was an outstanding warrant for his arrest.

{¶ 19} On May 31, 2017, law-enforcement officers from Brunswick Hills and Parma Heights Police Departments arrested Knuff at a friend's home where he had been staying. When Detective Sloan asked Knuff about Capobianco, Knuff answered the questions as though Mann and Capobianco were still alive. He told the detective, "If you can't find [Mann], I'd imagine they're together." He suggested that Detective Sloan go to Canton and check with Capobianco's friends, "Earl" and "Allen."

**{¶ 20}** A couple weeks after Knuff's arrest, on June 15, Parma Heights police officers responded to a report of a broken window at 6209 Nelwood Road. One of the responding officers, Scott Jackson, noted a strong odor and the presence of numerous flies when he approached the door of the residence, but officers found no one inside the house.

**{¶ 21}** On June 20, Detective Sloan sent an email to local law-enforcement agencies and the media identifying Capobianco as a missing person. When Officer Jackson read the height of Capobianco—4 feet, 11 inches—he realized that her body may have been concealed under the clutter of the house at 6209 Nelwood Road. He suggested that officers return to the house to search it more thoroughly.

**{¶ 22}** A search was conducted the next day. In one of the bedrooms, officers found several garbage bags piled around a bed. When they moved the bags, they uncovered two decomposing bodies that were later identified as Mann and Capobianco. Autopsies determined that both Mann's and Capobianco's cause of death was homicide caused by sharp-force injuries to the neck and trunk.

**{¶ 23}** Sometime in late June 2017, Stoner gave Parma Heights police detectives an undated letter that had been written by Knuff, which he had instructed her to deliver to his friend Robert Dlugo. Knuff wrote in the letter that he expected to be returned to prison soon; he stated:

> So now I'm really in a jam because before I get out, some evidence will be discovered * * *, I'll probably die in prison. * * * I need someone I can trust to go start a fire at the house I was staying at. * * * I have some trash bags in a back bedroom with clothes & papers that when discovered, my life is over. I was in the process of moving it all when I was arrested & now the only thing I can do is torch it all.

6

Knuff stressed how important the task was. "[I]f they go thru [sic] them bags," he wrote, "it[']s over for me bro."

{¶ 24} In the letter, Knuff promised Dlugo that he would be "well taken care of" and "won't ever have to want" because Knuff still had "30,000 $ [sic] from insurance money." He offered Dlugo $500 immediately and stated that he would split some insurance proceeds he had with Dlugo when he came home. He also provided detailed instructions on how to accomplish the arson, describing the house and pinpointing the location of the "most incriminating shit" in the back bedroom (where he had left the bodies).

{¶ 25} On June 29 and 30, 2017, Detective Sloan and Detective Luke Wittasek, also of the Parma Heights Police Department, conducted several interviews with Knuff. In these interviews, Knuff consistently claimed that after Capobianco stabbed Mann to death, she attacked Knuff and he killed her in self-defense.

{¶ 26} In the police interviews, Knuff's version of the events of May 11 was as follows: He had been trying to get Capobianco to move out of the house at 6209 Nelwood Road because he feared that he would be returned to prison for violating parole if his parole officer found Capobianco there using drugs or engaging in prostitution. On the evening of May 11, Capobianco had a prostitution "date" scheduled. Knuff gave her $65 or $70 that he had gotten from Stoner so that Capobianco could take her date to a motel. Capobianco left the house but later called Knuff, telling him that she was returning with her date. Knuff then left the house.

{¶ 27} According to Knuff, when he returned to the house, Capobianco was screaming and cursing at Mann. Knuff approached the back door, heard Mann cry in pain, and saw Capobianco assaulting Mann. At first, Knuff thought Capobianco was punching Mann, but he then saw that she was stabbing him with a knife.

**{¶ 28}** Knuff claimed that he had entered the house, disarmed Capobianco, and threw the knife aside. He stated that Capobianco then ran into the kitchen and that while he was checking on Mann, Capobianco returned with another knife and attacked him. Knuff said he got the second knife away from Capobianco, struggled with her, and finally pinned her down. Knuff told the detectives that Capobianco had been stabbed during the struggle.

**{¶ 29}** Knuff recounted to the detectives that he left the house after the stabbings. Realizing that he might go back to prison because of the killings, Knuff eventually decided he should clean up the crime scene. By his own admission, he undertook a variety of tasks to clean the crime scene, including dragging the bodies into a bedroom, covering the bodies, and trying to wipe away blood spatter.

## B. Procedural History

**{¶ 30}** Knuff was indicted on 21 counts:

| Count 1 | Aggravated murder of Capobianco with prior calculation and design, in violation of R.C. 2903.01(A), with four death-penalty specifications: one course-of-conduct specification for the purposeful killing of two or more persons, in violation of R.C. 2929.04(A)(5), and three felony-murder specifications—one predicated on aggravated burglary, one predicated on kidnapping, and one predicated on aggravated robbery—all in violation of R.C. 2929.04(A)(7) |
|---------|----------------------------------------------------------------------------------------------------------------------------------------|
| Count 2 | Aggravated murder of Capobianco, in violation of R.C. 2903.01(B), with four death-penalty specifications: one course-of-conduct specification for the purposeful killing of two or more persons, in violation of R.C. 2929.04(A)(5), and three felony-murder specifications—one predicated on aggravated burglary, one |

| | |
|---|---|
| | predicated on kidnapping, and one predicated on aggravated robbery—all in violation of R.C. 2929.04(A)(7) |
| Count 3 | Aggravated murder of Mann with prior calculation and design, in violation of R.C. 2903.01(A), with four death-penalty specifications: one course-of-conduct specification for the purposeful killing of two or more persons, in violation of R.C. 2929.04(A)(5), and three felony-murder specifications—one predicated on aggravated burglary, one predicated on kidnapping, and one predicted on aggravated robbery—all in violation of R.C. 2929.04(A)(7) |
| Count 4 | Aggravated murder of Mann, in violation of R.C. 2903.01(B), with four death-penalty specifications: one course-of-conduct specification for the purposeful killing of two or more persons, in violation of R.C. 2929.04(A)(5), and three felony-murder specifications—one predicated on aggravated burglary, one predicated on kidnapping, and one predicated on aggravated robbery—all in violation of R.C. 2929.04(A)(7) |
| Count 5 | Aggravated burglary, in violation of R.C. 2911.11(A)(1), with a notice-of-prior-conviction specification and a repeat-violent-offender specification |
| Count 6 | Aggravated robbery of Mann, in violation of R.C. 2911.01(A)(3), with a notice-of-prior-conviction specification and a repeat-violent-offender specification |
| Count 7 | Grand theft (of Mann's motor vehicle), in violation of R.C. 2913.02(A)(1) |
| Count 8 | Theft (of Mann's cellphone), in violation of R.C. 2913.02(A)(1) |

| Count 9 | Kidnapping (of Capobianco), in violation of R.C. 2905.01(A)(3), with a notice-of-prior-conviction specification and a repeat-violent-offender specification |
|---------|---|
| Count 10 | Kidnapping (of Mann), in violation of R.C. 2905.01(A)(3), with a notice-of-prior-conviction specification and a repeat-violent-offender specification |
| Count 11 | Gross abuse of a corpse (Capobianco), in violation of R.C. 2927.01(B) |
| Count 12 | Gross abuse of a corpse (Mann), in violation of R.C. 2927.01(B) |
| Count 13 | Breaking and entering (of Classic Hair Studio), in violation of R.C. 2911.13(A) |
| Count 14 | Vandalism (of the property of Classic Hair Studio), in violation of R.C. 2909.05(B)(1)(b) |
| Count 15 | Theft (of a cash register containing cash/money from Classic Hair Studio), in violation of R.C. 2913.02(A)(1) |
| Count 16 | Breaking and entering (of the property of Spa & Nails), in violation of R.C. 2911.13(A) |
| Count 17 | Vandalism (of the property of Spa & Nails), in violation of R.C. 2909.05(B)(1)(b) |
| Count 18 | Theft (of money or services from Spa & Nails), in violation of R.C. 2913.02(A)(1) |
| Count 19 | Attempted tampering with evidence, in violation of R.C. 2923.02 and 2921.12(A)(1) |
| Count 20 | Conspiracy (to commit or promote or facilitate the commission of aggravated arson), in violation of R.C. 2923.01(A)(1) |
| Count 21 | Conspiracy (to commit or promote or facilitate the commission of aggravated arson), in violation of R.C. 2923.01(A)(2) |

{¶ 31} A jury found Knuff guilty on all counts except Count 6, aggravated robbery, and the four felony-murder specifications predicated on aggravated robbery. Knuff was found guilty of all the other specifications: three death-penalty specifications for each aggravated-murder count, a notice-of-prior-conviction specification and a repeat-violent-offender specification for the aggravated-burglary count, and a notice-of-prior-conviction specification and a repeat-violent-offender specification for each kidnapping count.

{¶ 32} The trial court merged Count 1 with Count 2 (aggravated murder of Capobianco) and Count 3 with Count 4 (aggravated murder of Mann). Additionally, Count 9 (kidnapping of Capobianco) was merged with Count 2, and Count 10 (kidnapping of Mann) was merged with Count 4. The state elected to proceed with sentencing on the aggravated-felony-murder counts (Counts 2 and 4). The court also merged Counts 14 and 15 (vandalism and theft of the property of Classic Hair Studio) with Count 13 (breaking and entering of Classic Hair Studio) and Counts 17 and 18 (vandalism and theft of the property of Spa & Nails) with Count 16 (breaking and entering of Spa & Nails). And it merged the two conspiracy counts.

{¶ 33} After hearing mitigating evidence, the jury recommended death sentences on both aggravated-murder counts, and the trial-court judge sentenced Knuff to death on each count. The judge imposed an aggregate prison term of 37 years for the noncapital counts.

{¶ 34} Knuff appealed to this court, presenting 24 propositions of law. We affirm his convictions and death sentences, but we remand the cause for the limited purpose of correcting the judgment entry's imposition of court costs against Knuff.

## II. ANALYSIS[1]

### A. Proposition of Law No. I: Unrecorded Proceedings

{¶ 35} In his first proposition of law, Knuff contends that he suffered material prejudice because the trial court improperly failed to record certain "pretrial proceedings"—primarily pretrial conferences—and he also complains that no record was made of the jury's view of the crime scene.

{¶ 36} Knuff does not identify the pretrial conferences that he contends were not recorded. However, the trial court's docket reflects that frequently, pretrial conferences (sometimes the docket refers to these conferences as "pretrials") and "status hearings" were conducted by the court. The docket also indicates that numerous "attorney conferences" were held. (The trial court appears to have used these three terms interchangeably.) The majority of these pretrials, status hearings, and attorney conferences were not recorded. However, transcripts do exist for pretrials that were held on August 9, 2017, March 5, 2018, and April 9, 2019, and for attorney conferences that were held on June 20 and December 11, 2018.

{¶ 37} Crim.R. 42(D) requires trial courts to "conduct all pretrial and post-trial conferences on the record." The issue, then, is what follows from the trial court's failure to comply with Crim.R. 42(D).

{¶ 38} Knuff argues that the failure to comply is reversible error. He compares this case to *State v. Said*, 71 Ohio St.3d 473, 644 N.E.2d 337 (1994), and *State v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, 911 N.E.2d 862, in which this court held that the failure to record some proceedings constitutes reversible error. But those cases are distinguishable from this one.

---

1. We consider Knuff's propositions of law in approximately the order the alleged errors occurred in the proceedings.

{¶ 39} *Said* involved an unrecorded competency hearing for the five-year-old alleged victim—a hearing that was "an indispensable tool." *Said* at 476. Failing to record the hearing was a "fundamental" error that "preclude[d] a proper review of the application of [Evid.R. 807]." *Id*. at 475.

{¶ 40} The other case relied on by Knuff—*Clinkscale*—is significant because even though it did not involve a death sentence, the defendant was charged with a capital offense, *Clinkscale* at ¶ 11, and thus the case involved the principle that "the court must conduct proceedings in capital cases with a strict level of care that comports with their unique status," *id*. at ¶ 23. As in *Said*, the conclusion in *Clinkscale* was based on the critical nature of the unrecorded portion of the proceeding—the dismissal of a juror during the jury's deliberations, *see Clinkscale* at ¶ 5. In *Clinkscale*, this court stressed that the unrecorded matters involved "the dismissal and replacement of a deliberating juror," and we said that the recording of such matters was "of critical importance to protecting a defendant's constitutional rights." *Id*. at ¶ 15; *see also id.* at ¶ 18. Additionally, the defendant in *Clinkscale* had objected in the trial court to the lack of recording, (unsuccessfully) attempted to reconstruct the proceeding for the record, and suffered prejudice from the resulting inability to demonstrate whether the juror's dismissal had affected his constitutional rights. *Id*. at ¶ 16-18.

{¶ 41} The state directs us to another case for guidance—*State v. Palmer*, 80 Ohio St.3d 543, 687 N.E.2d 685 (1997), a capital case in which we declined to reverse the defendant's conviction, despite the trial court's failure to record conferences it held with the attorneys at the bench and in chambers and its failure to record a jury view. We held that

> reversal of convictions and sentences on grounds of some
> unrecorded bench and chambers conferences, off-the-record
> discussions, or other unrecorded proceedings will not occur in

situations where the defendant has failed to demonstrate that (1) a request was made at trial that the conferences be recorded or that objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue.

*Id.* at 554; *accord State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 138. Although the defendant in *Palmer* tried to reconstruct the unrecorded conferences, he could not show that his trial counsel had asked that they be recorded. Even more importantly, the defendant "failed to affirmatively demonstrate any material prejudice resulting from the unrecorded matters." *Palmer* at 554. "[O]ur cases clearly hold that prejudice will not be presumed from the mere existence of * * * unrecorded bench and chambers conferences in capital cases." *Id.*; *see also State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 135.

**{¶ 42}** The unrecorded pretrials at issue here are akin to the "relatively unimportant portions of [the] trial" that were at issue in *Palmer*, *Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, 911 N.E.2d 862, at ¶ 14. Furthermore, nothing in the record shows that Knuff's trial counsel asked that any of these pretrials be recorded. Nor has Knuff demonstrated any prejudice by the trial court's failure to record the pretrials. The failure to record the pretrials was not reversible error.

**{¶ 43}** Knuff also argues that the trial court erred in not recording the jury view. The record indicates that the court reporter attended the jury view—at least, the trial-court judge said she intended for the court reporter to attend—but the only record of the jury view is the following notation in the transcript: "Thereupon, The Court, Counsel, and Jury proceeded to a jury view." This notation suggests that defense counsel attended the jury view, but the transcript contains no indication

that defense counsel objected to its not being recorded. As with the pretrials, Knuff has failed to demonstrate that he objected at trial to the court's failure to record the jury view and that material prejudice resulted from that failure.

{¶ 44} Thus, we reject Knuff's first proposition of law.

## B. Proposition of Law No. VI: Severance

{¶ 45} In his sixth proposition of law, Knuff contends that the trial court erred by denying his motion to sever the breaking-and-entering and related vandalism and theft charges (Counts 13 through 18) from the indictment for a separate trial.

{¶ 46} "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). A defendant claiming error in the denial of severance must affirmatively show that his rights were prejudiced and that the trial court abused its discretion in refusing to grant separate trials. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. But the state may rebut the claim of prejudice by showing that it "could introduce evidence of the joined offenses as 'other acts' under Evid.R. 404(B)" or that " 'evidence of each crime joined at trial is simple and direct.' " *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 96, quoting *Lott* at 163.

{¶ 47} Here, the evidence supporting Counts 13 through 18 was sufficiently simple and direct to refute Knuff's claim of prejudice. The counts were proved principally by the testimony of the victimized shop owners, security-camera footage, crime-scene photos, and Knuff's admissions to police during his interrogation on June 13, 2017. This evidence was separate and distinct from the evidence that the state used to prove the murders and other crimes that Knuff committed at the house at 6209 Nelwood Road. It is highly unlikely that the jury was confused about which evidence applied to the break-ins and which applied to

the murders. *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 52.

**{¶ 48}** Accordingly, we reject Knuff's sixth proposition of law.

### C.  Proposition of Law No. VII: Right to Self-Representation

**{¶ 49}** Knuff's seventh proposition of law is that the trial court improperly refused his request to represent himself without inquiring whether his waiver of counsel was knowingly, voluntarily, and intelligently made.

**{¶ 50}** On April 17, 2019, eight days before jury selection began, Knuff's trial counsel informed the trial court: "[A]t this time I believe Mr. Knuff would like to make a motion to the court."  Knuff stated:

> First of all, let me say in no way am I trying to disrespect or delay any proffer to the court.  *It's something I have been considering strongly* over the last month-and-a-half, two months of *asking you to [let me] represent myself in this matter* because, for one, there is many things wrong with this case that I know are wrong.  It could be critical to the verdict one way or the other, and there is key documentation that I believe I'm the only one that would be able to pinpoint and say this is this and this is that to give me a fair standing in this trial.
>
> And I know one of the problems has been like the counsel-only block and trying to explain to my attorneys and * * * it's a life-or-death situation for me.  I'm facing the death penalty.  I know if I'm given the time, even a month or two of working fast and diligently, that I would be able to gather all the things that I know are there and if I were to present them to you, you would see that I'm not pulling your leg or wasting the court's time.  It's very critical stuff.  I believe it's key to my defense.

(Emphasis added.)

{¶ 51} The trial court immediately denied Knuff's motion. The court pointed out that the case had been on the docket for approximately two years and that Knuff's attorneys were two of the "most diligent and most experienced attorneys this state has." The judge added that she had talked to Knuff the prior week and that Knuff "probably should have mentioned [it then] if [he] were really serious about it."

{¶ 52} In response, Knuff acknowledged that his request was tardy, saying that he believed additional witnesses and evidence required investigation. He relayed that he had told his attorneys that he "really didn't want to do this on [his] own but [that he] felt that [they] needed a little more time." To this, the judge replied, "[E]very defendant that is coming up for trial * * * has the exact same argument * * *. It's typically a trial delay tactic." Accordingly, the judge denied Knuff's request as "untimely" and "disingenuous."

{¶ 53} After the trial-court judge denied Knuff's request, the prosecutor offered to remove the counsel-only designation from any discovery documents that Knuff wanted to review personally. The judge asked Knuff, "Does that help?" And Knuff replied: "Yeah, that helps. Like I said—yes, your Honor." That ended the discussion, and the topic of self-representation was not raised again.

{¶ 54} We have recognized that "a defendant in a state criminal trial has an independent constitutional right of self-representation and * * * may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). But this right—called a *Faretta* right—must be " 'timely and unequivocally asserted' " or else it is waived. *State v. Cassano*,

96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.3d 81, ¶ 38, quoting *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir.1990).

{¶ 55} Assertions of the right to self-representation must also be balanced " 'against considerations of judicial delay.' " *United States v. Powell*, 847 F.3d 760, 774 (6th Cir.2017), quoting *United States v. Martin*, 25 F.3d 293, 295-296 (6th Cir.1994). In fact, "[e]ven a clear request made prior to trial may be denied when it 'is merely a tactic to secure a delay in the proceeding.' " *Id.*, quoting *Robards v. Rees*, 789 F.2d 379, 383 (6th Cir.1986).

{¶ 56} "If a trial court denies the right of self-representation, when properly invoked, the denial is per se reversible error." *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 104. The contested issue here is whether Knuff properly invoked his *Faretta* right.

{¶ 57} The state contends that Knuff did not unequivocally invoke his right to self-representation and that he was seeking to delay the proceedings. But we need not decide whether Knuff's request for self-representation was unequivocal, because we conclude that the request—which was made just eight days before jury selection began—was untimely and was properly denied for that reason.

{¶ 58} "[A] request for self-representation can be denied when the request is untimely." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 76; *accord Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 161, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (defendant must make timely assertion of *Faretta* right).

{¶ 59} In *Faretta*, the defendant's declaration that he wanted to represent himself was made weeks before trial. 422 U.S. at 835, 95 S.Ct. 2525, 45 L.Ed.2d 562. The United States Supreme Court said, "In forcing Faretta, *under these circumstances*, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense." (Emphasis added.) *Id.* at 836. Thus, "to the extent that *Faretta* addresses

timeliness, as a matter of clearly established law it can only be read to require a court to grant a self-representation request when the request occurs *weeks* before trial." (Emphasis added.) *Hill v. Curtin*, 792 F.3d 670, 678 (6th Cir.2014) (en banc).

{¶ 60} Many courts have held that a motion for self-representation is timely when it is made any time before the trial begins. *See State v. Christian*, 657 N.W.2d 186, 191-193 (Minn.2003) (motion timely when made before voir dire begins); *United States v. Johnson*, 223 F.3d 665, 668 (7th Cir.2000) (motion timely when made before jury empaneled) (citing cases from Tenth and Second Circuits); *United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir.1979) (motion timely when made before "meaningful trial proceedings" have commenced). However, other courts have held that a request is untimely if it is not made "within a reasonable time prior to commencement of trial." *People v. Windham*, 19 Cal.3d 121, 127-128, 560 P.2d 1187 (1977). *Accord Lyons v. State*, 106 Nev. 438, 445-446, 796 P.2d 210 (1990), *clarified on other grounds by Vanisi v. State*, 117 Nev. 330, 341, 22 P.3d 1164 (2001).

{¶ 61} We have rejected a bright-line rule that a motion for self-representation is timely when it is made "any time before trial." *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 40 (defendant's request made three days before trial was untimely).[2] Yet Knuff argues that a motion for self-representation that is made eight days before trial, as his was, should be considered timely because in each of the cases cited in *Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, the court found timely a motion for self-representation

---

2. Admittedly, in *Cassano v. Shoop*, the United States Court of Appeals for the Sixth Circuit rejected our conclusion in *State v. Cassano* that Cassano's motion for self-representation was untimely. *Shoop*, 1 F.4th 458, 474-475 (6th Cir.2021). But *State v. Cassano* is distinguishable from this case because Cassano's motion for self-representation that was made three days before trial was *not* his first such motion. Indeed, the Sixth Circuit acknowledged that the request made three days before trial "might have been untimely" had it been Cassano's first request. *Shoop* at 475. *Cassano* is further distinguishable because the trial court "contribut[ed] to Cassano's purportedly untimely request" by telling him months earlier that he had no right to represent himself. *Shoop* at 475.

that was made even closer than eight days before trial. While Knuff's assertion regarding the cases cited in *Neyland* is true, courts have also found requests similar to Knuff's to be untimely. *See United States v. Smith*, 413 F.3d 1253, 1281 (10th Cir.2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011 (10th Cir.2009); *People v. Ruiz*, 142 Cal.App.3d 780, 784, 790-791, 191 Cal.Rptr. 249 (1983).

{¶ 62} And other factors affect the timeliness determination: the need for a continuance if the motion is granted, the number of previous defense-requested continuances, the length of time the case has been pending, any previous expressions of dissatisfaction with counsel by the defendant, and the complexity of the case. In *Smith*, for instance, the Tenth Circuit deemed a motion for self-representation untimely because it was asserted six days before trial in a complex case that had been going on for nearly a year, that had previously been continued, and that would require a lengthy continuance if the request were granted. *Smith* at 1281; *see also, e.g.*, *Lyons* at 446 (request timely if made early enough to allow defendant to prepare for trial *without* continuance). "The requirement of timeliness is to avoid unjustifiable delay or disruption of orderly court proceedings." *Ruiz* at 791.

{¶ 63} Here, Knuff indicated that if he were allowed to represent himself, he might need "a month or two" to "gather all the things that [he knew were] there." The indictment was filed on July 10, 2017, so the case had been pending 21 months when Knuff moved to represent himself on April 17, 2019, eight days before the trial was scheduled to begin. And Knuff had already been granted three continuances. Knuff had not previously indicated any dissatisfaction with counsel or even hinted at wishing to represent himself. Under these circumstances, we hold that Knuff's request to represent himself was untimely.

{¶ 64} Because Knuff's motion to represent himself was untimely, the trial court did not err by denying it without first inquiring into the knowing, intelligent,

and voluntary nature of Knuff's attempted waiver of counsel. Accordingly, we reject Knuff's seventh proposition of law.

### D. Proposition of Law No. VIII: Jury Selection

{¶ 65} Knuff argues in his eighth proposition of law that the trial court unreasonably restricted his counsel's voir dire questioning, thereby denying him a meaningful, constitutionally adequate voir dire.

{¶ 66} During voir dire, defense counsel told several prospective jurors that at the start of the penalty phase, Knuff would be entitled to a "presumption of a life sentence." Eventually, the state objected to defense counsel's use of the word "presumption" in the context of the penalty phase. The prosecutor explained that he did not object to defense counsel's telling prospective jurors that the state had the burden of proof on the issue of a death sentence but that counsel's use of the word "presumption" was inconsistent with this court's precedent. Defense counsel agreed to use different language and continued questioning prospective jurors with the following preface: "When we start this second phase, presume a death sentence can only be imposed if the State of Ohio proves to you beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors."

{¶ 67} Later during voir dire, defense counsel said to a prospective juror: "[I]t's assumed that he should get a life sentence unless and until the government can prove beyond a reasonable doubt that those aggravating circumstances outweigh any mitigation." The prosecutor objected. At sidebar, the trial court asked defense counsel to "lay the options out" neutrally, "without saying we're starting with life options." Defense counsel responded:

> The life options are there no matter what. That's all I've said. * * * You have life options on the table. One of those is an appropriate sentence that the legislature found for this crime. If they prove beyond a reasonable doubt the aggravating circumstances

21

outweigh the mitigating factors, then it's death. Otherwise, these

[life sentences] are just as appropriate penalties.

**{¶ 68}** The trial court said: "That's fine. * * * Can we say it like that?" Defense counsel replied that he could but that he preferred to "say it the way [he'd] been saying it." The trial-court judge said, "I like the way you said it just now." When defense counsel sought a yes or no ruling on his use of the "presumption" language, the judge replied: "I'm telling you I like the new way that you're saying it" (i.e., without "presumption").

**{¶ 69}** During further voir dire questioning, defense counsel told prospective jurors that in the penalty phase, the jury would "start out with" a life sentence and could return a death sentence only if the state carried its burden.

**{¶ 70}** A trial-court judge has discretion over the scope, length, and manner of voir dire. *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40; *State v. Getsy*, 84 Ohio St.3d 180, 190, 702 N.E.2d 866 (1998). However, "[q]uestions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 57, citing *Morgan v. Illinois*, 504 U.S. 719, 734-735, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

**{¶ 71}** Knuff contends that the trial court's restriction on defense counsel's use of the word "presumption" during voir dire questioning was improper and arbitrary. He argues that it was "critical for the defense to ensure that the jurors understood the weighing process as a vehicle by which mercy can be expressed and that a death sentence could only be imposed if the State carried its burden" of establishing that the aggravating circumstances outweigh the mitigating factors.

**{¶ 72}** But the trial court *did* allow defense counsel to explain the state's burden to prospective jurors, even allowing counsel to say that a life sentence is

what they "start out with" when considering the sentence. Knuff does not expound on why his counsel's use of the specific phrase "presumption of life" during voir dire questioning was necessary to convey this concept. Nor does he cite any authority holding that defense counsel was entitled to use that phrase.

**{¶ 73}** Ultimately, the issue is whether the trial court, by barring defense counsel from using the phrase "presumption of life" during voir dire prevented counsel from engaging in questioning that was "sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors," *Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 57. Counsel was not so prevented. Accordingly, Knuff's eighth proposition of law is rejected.

### E. Proposition of Law No. IX: Challenges for Cause

**{¶ 74}** Knuff's ninth proposition of law also focuses on voir dire. Knuff contends that the trial court erroneously overruled his for-cause challenges to prospective juror Nos. 5 and 20 and erroneously granted the state's for-cause challenges to five prospective jurors.

**{¶ 75}** As this court has explained:

> On a challenge for cause, the ultimate question is whether the juror swore that he could set aside any opinion he might hold and decide the case on the evidence, and whether the juror's protestation of impartiality should be believed. This determination necessarily involves a judgment on credibility, so deference must be paid to the trial judge who sees and hears the juror. Hence, a trial court's resolution of a challenge for cause will be upheld unless it is unsupported by substantial testimony, so as to constitute an abuse of discretion.

(Cleaned up.) *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 42. Knuff has not demonstrated that the trial court abused its discretion with respect to any of the for-cause challenges.

### 1. The Trial Court Did Not Abuse Its Discretion in Overruling Knuff's For-Cause Challenges

#### a. Prospective juror No. 5

{¶ 76} On his juror questionnaire in response to the inquiry "What are your general feelings about the death penalty, and why do you feel that way," prospective juror No. 5 wrote that he believes the death penalty is "a viable option, provided that there is no doubt as to the guilt of the individual, and that the crime committed was intentional, and meet[s] the requirements defined by law to justify [its] use." When asked during voir dire what he meant by that response, he explained that he "would not exclude" the death penalty from consideration and that his decision whether to vote to impose the death penalty "would depend on * * * the trial." Prospective juror No. 5 also checked a box on the questionnaire indicating his agreement with the following statement: "I favor the death penalty, but would **not always** vote for it in every case of aggravated murder. I **would** seriously weigh and consider the aggravating and mitigating factors to determine the appropriate penalty in this case." (Boldface sic.)

{¶ 77} When questioned during voir dire, prospective juror No. 5 agreed that if the state failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors in a case, he could impose a life sentence without having any reservations or hesitations about doing so. The prosecutor subsequently asked: "Even though the Defendant is found guilty, would you still be fair and open-minded and consider any mitigation in terms of conducting that weighing process * * *?" The prospective juror said he would. He thereafter reaffirmed his willingness to impose a life sentence in some cases.

{¶ 78} Later, defense counsel asked the prospective juror about his understanding of the process of weighing the aggravating circumstances against the mitigating factors in a death-penalty case. Defense counsel explained that mitigating factors are "[r]easons that would suggest to you * * * that a life sentence is more appropriate than a death sentence," including "the Defendant's background, upbringing, [and] childhood." Defense counsel then asked the prospective juror whether he could consider a defendant's daily drug use in the fifth grade as a mitigating factor. To this, the prospective juror responded: "I guess it would depend to me on if he was in fifth grade and this happened what was done in the last however many years since then. I mean, we all have stuff that happened to us as kids." Even though the prospective juror said that he would not consider marijuana use as a youth "as an explanation" for committing the type of murders at issue in this case and that he would not "weigh [it] heavily" as a mitigating factor, he repeatedly stated that he would give that factor some weight in mitigation, and he agreed that he would give that factor "fair consideration." He relayed that other aspects of a defendant's childhood—such as the use of "[h]arder drugs" or being the victim of child abuse—might carry more weight with him.

{¶ 79} Defense counsel challenged prospective juror No. 5 for cause, stating that the mitigation case may include evidence that Knuff had used drugs in the fifth and sixth grades and that prospective juror No. 5 could not "adequately weigh that specific mitigating factor." Defense counsel argued, "I understand that when pressed [prospective juror No. 5] did say, 'Sure, I'll consider it,' " but counsel contended that "based on the totality of his answers and his demeanor, [prospective juror No. 5] would merely acquiesce to listening to [that evidence] and not *fairly* consider it." (Emphasis added.)

{¶ 80} The trial court overruled the challenge, noting that the prospective juror's answers were "thoughtful and clear, [and] that he would consider all of those

options, including drug use in the fifth grade." Defense counsel ultimately used a peremptory challenge to have this prospective juror excused.

{¶ 81} The record discloses no basis for Knuff's claim that prospective juror No. 5 would not fairly weigh juvenile drug use as a mitigating factor in this case. Knuff has failed to show that the trial court abused its discretion in denying his challenge of prospective juror No. 5 for cause.

*b. Prospective juror No. 20*

{¶ 82} The defense initially asked that prospective juror No. 20 be excused without any voir dire because he had served on a jury in a capital case in approximately 1995 and had voted to sentence the defendant in that case to death. Defense counsel argued that no matter what counsel said at trial, prospective juror No. 20 would inevitably draw comparisons between this case and the earlier one that would be "unfairly prejudicial to [Knuff] and/or the State"; counsel also contended that prospective juror No. 20 would be inclined to vote for death in this case because he had done so before.

{¶ 83} The trial court decided to examine the prospective juror. The trial court asked prospective juror No. 20 whether he could serve on a capital-case jury again "and be fair and impartial." The prospective juror replied: "Oh, sure. Very much so." He also confirmed that he could separate his views in this case from those he had in the earlier case in which he had served as a juror. Extensive voir dire from defense counsel and the state revealed that prospective juror No. 20 recalled very little of his prior capital-case jury service.

{¶ 84} Prospective juror No. 20 also stated that he could vote to impose a life sentence and that he would consider all the evidence that would be presented in mitigation. He expressed his belief that death is an appropriate penalty for "gruesome" crimes but is not the only appropriate penalty.

{¶ 85} After the voir dire of prospective juror No. 20, defense counsel renewed his challenge for cause. Counsel stated, "I don't think it's appropriate that

somebody that has been through this process and has already rendered a death verdict * * * should be placed on another jury" in a capital case. The trial court agreed with the state that the prospective juror's voir dire responses indicated his ability to be fair and impartial as a juror in this case and overruled the challenge.

{¶ 86} Prior jury service automatically disqualifies a prospective juror from service only if the prospective juror served on the grand jury that found the indictment, Crim.R. 24(C)(3), on a petit jury in the same case against the same defendant, Crim.R. 24(C)(4), or on the jury in a civil action against the same defendant for the same act, Crim.R. 24(C)(5). *See also* R.C. 2945.25(E) and (F). The trial court did not abuse its discretion in denying defense counsel's for-cause challenge to prospective juror No. 20.

### 2. *The Trial Court Did Not Improperly Grant the State's For-Cause Challenges*

{¶ 87} Knuff also argues that the trial court improperly granted the state's for-cause challenges to prospective juror Nos. 7, 80, 93, 118, and 120—each of whom indicated harboring reservations about the death penalty. We find no merit in this argument.

{¶ 88} Excluding an impartial prospective juror for cause solely because the prospective juror expresses reservations about imposing the death penalty is constitutionally impermissible. *State v. Keith*, 79 Ohio St.3d 514, 519-520, 684 N.E.2d 47 (1997), citing *Witherspoon v. Illinois*, 391 U.S. 510, 520-523, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Such a prospective juror may be excluded only if his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *see also State v. Rogers*, 17 Ohio St.3d 174, 478 N.E.2d 984 (1985), paragraph three of the syllabus, *vacated on other grounds*, 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452 (1985).

{¶ 89} We will not disturb a trial court's ruling on a challenge for cause "unless it is manifestly arbitrary and unsupported by substantial testimony, so as to

constitute an abuse of discretion." *State v. Williams*, 79 Ohio St.3d 1, 8, 679 N.E.2d 646 (1997).

### a. Prospective juror No. 7

{¶ 90} In response to the inquiry on the jury questionnaire about her "general feelings about the death penalty," prospective juror No. 7 wrote: "We don't have the right to kill people.  Life sentence.  No parole."  And in response to a question asking her to check whichever statement "most accurately state[d] [her] **opinion** regarding the death penalty," prospective juror No. 7 checked: "I would never vote for the death penalty in any case.  I am so strongly opposed to the death penalty that I would **always** vote against the death penalty no matter what the evidence is."  (Boldface sic.)  Although she said during voir dire that she could "follow the rules" when given instructions by a judge regarding how to apply the law, she also revealed that no matter how heinous the crime, she could not vote to impose the death penalty in a capital case and that she would not want to be put in a position to have to vote that way on a jury if the law required her to do so.

{¶ 91} The trial court upheld the state's challenge for cause of prospective juror No. 7.  The court observed that even though the prospective juror was saying that she would follow the law and the judge's instructions, her body language was saying something different.  The trial court explained:

> She was actually shaking her head no.  She was physically shaking her head no during the questioning portion of whether she could sign her name on a death verdict.  She was shaking her head no, but saying that she would follow the law out of her mouth.
>
> * * *
>
> [S]he was shaking her head no when [counsel] talked to her about whether she would be willing to sign a death verdict, so [the] motion for cause is granted at this time.

{¶ 92} The trial court's decision was supported by prospective juror No. 7's questionnaire and voir dire responses and the court's own observations of her demeanor. Under these circumstances, we conclude that the trial court did not abuse its discretion in granting the state's for-cause challenge to prospective juror No. 7.

### b. Prospective juror No. 80

{¶ 93} Prospective juror No. 80 indicated on his questionnaire that he would not vote for the death penalty in any case, no matter what the evidence showed, and that he would be unable to sign a verdict imposing a death sentence. During voir dire, prospective juror No. 80 reiterated his feelings about the death penalty; he stated that "probably" nothing the court could say would change his position. Much like prospective juror No. 7, prospective juror No. 80 stated that he would follow the law if he were selected as a juror. The trial court sua sponte excused prospective juror No. 80 for cause. Defense counsel objected to the excusal because the prospective juror had said that if selected as a juror, he would follow the law and the court's instructions despite his feelings about the death penalty.

{¶ 94} Prospective juror No. 80 contradicted himself during voir dire— saying first that he would always vote against imposing the death penalty, then saying that he would follow the law, thereby raising a credibility issue for the trial court. Knuff cites nothing in the record to show that the trial court abused its discretion in excusing prospective juror No. 80 for cause.

### c. Prospective juror No. 93

{¶ 95} Prospective juror No. 93 strongly opposed capital punishment. On his questionnaire, he indicated that he would never vote for the death penalty in any case. He wrote that he would fairly consider mitigating evidence "but only in furtherance of a verdict other than the death penalty." Finally, prospective juror No. 93 indicated that he did not think he would be able to sign a death verdict.

**{¶ 96}** During voir dire, prospective juror No. 93 backed away from these positions, saying that he "would have no problem applying the law" and that "[i]f the law required [him] to find a certain way, [he was] going to follow the law." He stated that he would find it "very difficult" to sign a death verdict but that he "suppose[d]" he could do so "out of respect for the system of law that we have."

**{¶ 97}** Prospective juror No. 93 stated that while he could consider imposing a death sentence in a case with few or no mitigating factors and in which the aggravating circumstances were "overwhelming," he "would be looking for reasons to find those mitigating factors and to apply them in a way that allowed [him] to not apply the death penalty." Prospective juror No. 93 stated:

> I'm not trying to suggest that I would be creating things, but if there is information there that would allow me to reasonabl[y] find one way or the other, * * * my general perspective on it is that I'm going to lead [sic] towards the direction that would allow me to find a no verdict on the death penalty.

**{¶ 98}** The prosecutor tried to get prospective juror No. 93 to clarify his position:

> [PROSECUTOR]: * * * No one will ever tell you how you're going to weigh the aggravation against the mitigation. That's up to you. So knowing that, do you think that you would ever be able to find or would you ever find that the aggravation outweighs the mitigation knowing that that would then mean you have to impose the death penalty?
>
> [PROSPECTIVE] JUROR NO. 93: No.

30

{¶ 99} Defense counsel subsequently asked prospective juror No. 93 whether he could "fairly weigh" the aggravating circumstances against the mitigating factors, and he replied that he "could engage in the [weighing] process." Defense counsel questioned him further: "If you found that the aggravating circumstances outweighed the mitigating factors by proof beyond a reasonable doubt, * * * would you return a verdict for the death penalty?" Prospective juror No. 93 responded, "I would, but I'd be very unlikely to find that, I think." The prospective juror reaffirmed his commitment, however, to "engage in the process of following the law."

{¶ 100} The record supports this prospective juror's excusal for cause because his responses on the questionnaire and during voir dire indicated that his views would "substantially impair the performance of his duties as a juror," *Adams*, 448 U.S. at 45, 100 S.Ct. 2521, 65 L.Ed.2d 581. The trial court therefore did not abuse its discretion when it excused prospective juror No. 93 for cause.

### d. Prospective juror No. 118

{¶ 101} Prospective juror No. 118 wrote on her questionnaire that she was "completely against" capital punishment, which she described as "barbaric," "unjust," and "immoral in every case," even for "extremely heinous crimes." Further, she wrote that she "would not take into consideration evidence that might suggest[] that the defendant 'deserves' the death penalty." In response to the question inquiring if she could sign her name to a death verdict, she wrote: "I could not, in good conscious [sic], give any living being the death penalty." And she checked the statement indicating that she would never vote for the death penalty, no matter what the evidence showed. Prospective juror No. 118 reiterated her views during voir dire.

{¶ 102} Defense counsel asked prospective juror No. 118: "If Ohio law said that we have a death penalty, would you follow the law if the Judge instructed you to?" She answered: "If a judge absolutely told me to do something, I don't want to

be arrested, but I would have really strong compunction against it." She acknowledged that she was unsure whether she could sign a death verdict and whether she could engage in the process of weighing the aggravating circumstances against the mitigating factors in a capital case.

{¶ 103} When defense counsel questioned prospective juror No. 118 about whether she could "follow the law regarding the death penalty as [the trial court] would give it to [her] and impose [the death penalty] if it was mandated under the evidence," she responded, "If I absolutely had to, if the Judge said that, I guess." But the prospective juror admitted that she would be compromising her beliefs in that situation, and she stated, "I wouldn't want to do that."

{¶ 104} The trial court excused prospective juror No. 118 for cause over defense counsel's objection. The court said that prospective juror No. 118 "seem[ed] to be adamantly opposed to the death penalty." The court noted that even though the prospective juror had stated a willingness to follow the law, the court believed, based in part on the prospective juror's body language and tone of voice during voir dire, that those statements were "hesitant" and "forced."

{¶ 105} The record supports the trial court's determination. The trial court therefore did not abuse its discretion in excusing prospective juror No. 118 for cause.

### e. Prospective juror No. 120

{¶ 106} Prospective juror No. 120 was not categorically opposed to the death penalty; she wrote on her questionnaire that it "should be used as a last resort." Despite that position, she checked "No" in answer to the question, "Do you think that you would be able to sign your name to a verdict imposing the death penalty?" However, she indicated that she would not vote against it in every case.

{¶ 107} During voir dire, she confirmed that she had not misunderstood the question. She said, "I wouldn't want to choose if someone lives or dies, to be honest." Twice she stated, "I don't think I would be able to live with that." Later,

she said that she would be able to follow the law, but she struggled with how she could live with a decision to impose the death sentence. She ultimately told the prosecutor that she did not feel that she could sign her name to a death verdict. But after defense counsel explained the process of weighing the aggravating circumstances against the mitigating factors to her, prospective juror No. 120 stated that she could put aside her moral, religious, and philosophical beliefs and follow the law.

{¶ 108} The state challenged prospective juror No. 120 for cause on the ground that she had said she could not sign a death verdict. Defense counsel stated that no such question had been asked. The trial court then resumed voir dire, directly asking the prospective juror: "If the aggravating circumstances outweigh the mitigating factors in this case, the law says that you must sign the verdict for death. Could you do that?" The prospective juror replied: "I'm sorry. No." The trial court then excused her for cause.

{¶ 109} The trial court did not act unreasonably or arbitrarily by giving credence to prospective juror No. 120's statements that she could not sign a death verdict and therefore did not abuse its discretion in excusing prospective juror No. 120 for cause.

{¶ 110} Knuff has failed to show any abuse of discretion by the trial court with respect to the challenges for cause. We therefore reject his ninth proposition of law.

### F. Proposition of Law No. X: Religious Freedom

{¶ 111} Knuff's tenth proposition of law is that the practice of death-qualifying prospective jurors violates the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution to the extent that it excludes prospective jurors whose opposition to capital punishment is based on their religious beliefs. Knuff claims that 19 prospective jurors were excused for cause because they opposed capital punishment on religious or moral grounds. He

further argues that his trial counsel rendered ineffective assistance by failing to preserve his First Amendment claim with respect to the excusal of 16 of those prospective jurors because his counsel failed to object to their being excused. Finally, Knuff contends that death qualification denies a defendant the right to be tried to an impartial jury and to a jury drawn from a fair cross-section of the community.

{¶ 112} We recently rejected the contention that death qualification of prospective jurors violates their First Amendment rights. *See Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, at ¶ 94-96. And the United States Supreme Court rejected fair-cross-section and impartiality arguments in *Lockhart v. McCree*, 476 U.S. 162, 168-184, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). We find no reason to depart from the holdings in those cases.

{¶ 113} Given these precedents, defense counsel was not ineffective for failing to press an unmeritorious First Amendment claim. We thus reject Knuff's tenth proposition of law.

### G. Proposition of Law No. II: Improper Character Evidence

{¶ 114} In his second proposition of law, Knuff contends that the state introduced evidence that was irrelevant or of little relevance but was prejudicial because it showed his bad character.

{¶ 115} Evidence of a person's character is generally not admissible to prove that the person acted in conformity therewith on a particular occasion. Evid.R. 404(A). Likewise, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Former Evid.R. 404(B).[3] 132 Ohio St.3d XCVII, CXLVII (effective

---

3. The language of Evid.R. 404(B) was revised in 2022. Effective July 1, 2022, the rule reads:

(B) Other Crimes, Wrongs or Acts.

July 1, 2012, through June 30, 2022).  But Evid.R. 404(B) does allow "evidence of the defendant's other crimes, wrongs, or acts to be admitted *for other purposes*, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." (Cleaned up; emphasis sic.)  *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 116} When evidence is challenged as inadmissible other-acts evidence, a trial court must perform a three-step analysis:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.  Evid.R. 401.  The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).  The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.  *See* Evid.R. 403.

*State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 19-20; *see also Hartman* at ¶ 24-33.

---

(1) Prohibited Uses.  Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

### 1. Knuff's Prior Imprisonment and Release on Parole

{¶ 117} Knuff complains that the state introduced evidence that he had recently been released from prison and was on parole at the time of the murders. During the trial, Knuff did not object to any of the testimony about which he now complains, so we review this claim for plain error. To show plain error, Knuff must demonstrate that "an error occurred, that the error was obvious, and that there is 'a reasonable *probability* that the error resulted in prejudice,' meaning that the error affected the outcome of the trial" (emphasis added in *Rogers*), *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 66, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

{¶ 118} Knuff cannot demonstrate error with respect to the testimony about which he now complains. Evidence of Knuff's prior imprisonment and recent parole status was not admitted to prove his character or to show his conformity with that character. Instead, that evidence was essential to telling the story of these crimes.

{¶ 119} First, the evidence in question explained how Knuff became involved with Mann and Capobianco: he became acquainted with Capobianco as a pen pal while in prison and turned to Capobianco and her friend Mann for help obtaining a place to stay upon his release from prison. Second, the testimony of Knuff's parole officer, Fisher, also established why Knuff was living at the house at 6209 Nelwood Road when Mann and Capobianco were murdered and why he had tried to get Capobianco out of the house for her date on the night of May 11— because any drug use or prostitution at that house could have resulted in revocation of Knuff's parole and his return to prison.

{¶ 120} Third, Knuff's almost 16-year incarceration explained the intensity of his desire not to return to prison. That desire was his stated reason for leaving Mann's and Capobianco's bodies in the house instead of reporting the incident to the police.

{¶ 121} Finally, Knuff's prior incarceration and recent parole status were relevant to the story of his relationship with Stoner, who was a major participant in the events surrounding the murders and an important state witness. The state was entitled to explain how Knuff and Stoner knew each other. Stoner's relationship with Knuff was also crucial to evaluating her credibility. Knuff and Stoner formed their attachment while Knuff was in prison and Stoner was employed with the Department of Rehabilitation and Correction ("DRC"). Stoner actually resigned from her DRC job for the sake of her relationship with Knuff.

{¶ 122} Indeed, at trial, defense counsel recognized the relevance of Knuff's prior imprisonment and his relationship with Stoner, mentioning both subjects in his guilt-phase opening statement. Knuff has not demonstrated that the trial court plainly erred in allowing the challenged testimony.

### 2. Knuff's Relationship with His Son

{¶ 123} Knuff asserts that evidence of his relationship with his son constituted proof that he "was and is a bad father." Knuff complains that the state introduced evidence that he was absent from Tommy's life while in prison; that he did not contact Tommy during the 2015 and 2016 holidays; that he taught Tommy how to make "prison alcohol"; that he took Tommy's cellphone and car without Tommy's permission and never apologized for doing so; and that Tommy suffered emotionally as a result of dealing with Knuff between his release from prison and his arrest for the murders of Mann and Capobianco. Again, the testimony complained of was not objected to at trial, so the standard of review is plain error.

{¶ 124} No plain error is evident. As was true of Stoner, Tommy was an important witness, so his relationship with Knuff was relevant. Tommy's testimony showed his deep love for his father, which helped the jurors determine his credibility and explained his own conduct. By failing to object to Tommy's testimony on these matters at trial, Knuff has forfeited his claim in the absence of

plain error. *See, e.g.*, *McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, at ¶ 198.

### 3. *Knuff's Relationship with His Sister*

{¶ 125} Knuff also argues that evidence of his relationship with his sister, Melissa Walters, constituted proof that he "was and is a bad brother." Walters testified that her relationship with Knuff changed when their mother died and they had a dispute over insurance proceeds. According to Walters, because Knuff was still in prison when their mother died, he gave her his power of attorney ("POA") so she could "help him while he was there * * * [i]f he needed anything." The day after giving Walters his POA, Knuff revoked the POA because he and Walters had had an argument and he no longer trusted her. This dispute so upset Walters that she did not speak to her brother again until his release from prison in 2017.

{¶ 126} The state argues that this testimony from Walters "was relevant to establish context with respect to the relationship between sister and brother," but the state fails to explain how this particular relationship proves anything relevant to the case at hand. Thus, the testimonial evidence presented by Walters "fails the first part of the *Williams* test: relevance," *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 162.

{¶ 127} However, defense counsel did not object to Walters's testimony at trial, and Knuff has not demonstrated the existence of a reasonable probability that any error in allowing the testimony from his sister affected the outcome of the trial.

### 4. *Knuff's Use of the Word "Racist"*

{¶ 128} Bryan Gardner, the psychiatric nurse who treated Knuff at Akron General, testified that as part of the intake process, he asked Knuff to identify any triggers that may cause him agitation. Over an objection by defense counsel, Gardner testified that Knuff said his triggers were "[r]acist shit and people being ignorant."

{¶ 129} Defense counsel argued at trial that this response prejudiced Knuff by making him appear to be a racist. The trial court overruled the objection, noting that Knuff's words were not racist or otherwise inflammatory in the context in which they were used. The court interpreted Knuff's statement as meaning, "I don't like racist people or ignorant people."

{¶ 130} Knuff now renews his argument that the "racist shit" response suggested that he "was and is a racist." Although it is unclear to this court how Gardner's response regarding Knuff's reported triggers and agitations was relevant to the trial, Knuff's claim of prejudice is unfounded. Knuff said "[r]acist shit" was a trigger (i.e., something that would upset him). A reasonable juror would not interpret Knuff's use of the word "racist" in this context as an *avowal* of racism. Because no likelihood exists that Gardner's testimony on this issue was prejudicial, any error was harmless beyond a reasonable doubt.

### 5. *Knuff's Drug Use*

{¶ 131} Knuff claims that testimony about his drug use should have been excluded. Specifically, he complains that (1) Sergeant Dunbar testified that Knuff had "some kind of glass pipe" in his hand when he confronted Knuff on the highway, (2) Dr. Beskid testified that when Knuff was taken to Medina General, his toxicology screen was positive for cocaine and THC, and Nurse Gardner from Akron General testified that Knuff was "pretty open" about his drug use, and (3) Stoner testified that she knew Knuff had used drugs, including cocaine, in the past.

{¶ 132} Knuff did not object to any of this evidence at trial, so he has forfeited all but plain error. Knuff has not shown the requisite prejudice to demonstrate plain error. To begin with, considerable evidence was admitted at trial of Knuff's drug use, the admission of which Knuff is *not* claiming as error. Much of that evidence was included in the police-interrogation videos in which Knuff frequently and candidly acknowledged buying and using drugs. Indeed, he

frequently cited his drug use to the detectives as the reason for his claimed memory lapses and his irrational behavior after the murders.

**{¶ 133}** Moreover, Knuff's drug habit was relevant. Knuff admitted to the police that he had stolen Mann's car after the stabbings and traded it to a "dope boy" for crack.

### 6. Knuff's "Mental Issues"

**{¶ 134}** Knuff complains that some of the state's evidence suggested he had "mental issues." Specifically, he complains about certain testimony presented by Sergeant Dunbar and Nurse Gardner.

**{¶ 135}** Sergeant Dunbar testified on direct examination that when he encountered Knuff on the highway, Knuff said something to the effect of, "I don't want to live, just kill me." Sergeant Dunbar further testified that Knuff was "pink slipped" so that he could be held for psychiatric evaluation given his threats to harm himself. Nurse Gardner testified that he worked in the psychiatric unit at Akron General, where Knuff was transferred for psychiatric evaluation. Knuff did not object to any of this testimony at trial.

**{¶ 136}** No plain error is apparent by the admission of this testimonial evidence. The state did not use the testimony to show Knuff's character, and Knuff does not explain how the information that he was hospitalized for having threatened self-harm prejudiced him at trial.

### 7. Witness Who Feared "Payback"

**{¶ 137}** Gregory Harrison, a rideshare driver who gave Knuff a ride late in the evening on May 14, 2017, testified for the state at trial. Harrison testified that he was initially hesitant to drive Knuff because Knuff had tattooed hands and therefore seemed "[s]ketchy" to him.

**{¶ 138}** The prosecutor asked Harrison if he was nervous about testifying at trial, and Harrison said he was. The prosecutor then asked: "Are you afraid as you sit here today of any sort of payback?" Defense counsel's objection to this

question was sustained, so Harrison did not answer. Defense counsel did not ask for a curative instruction or to have the question stricken but instead asked for a mistrial, which was denied.

{¶ 139} At sidebar, the prosecutor informed the trial court that before testifying, Harrison had "indicate[d] that he [was] terrified because he [knew about Knuff's] botched escape plan and [he was] afraid that * * * Knuff [had] people on the outside who would * * * not only help him escape but also * * * provide payback for testifying witnesses." The court noted that Harrison was visibly shaking during his testimony.

{¶ 140} The trial court did not abuse its discretion in denying defense counsel's motion for a mistrial. Evidence of a witness's fear of retaliation for testifying bears on that witness's credibility. *See, e.g.*, *State v. Young*, 8th Dist. Cuyahoga No. 110973, 2022-Ohio-3132, ¶ 80 ("Testimony that a witness fears reprisal for testifying is admissible because it is relevant to the witness's credibility"); *State v. Battle*, 10th Dist. Franklin No. 18AP-728, 2019-Ohio-2931, ¶ 24; *People v. Mendoza*, 52 Cal.4th 1056, 1084, 132 Cal.Rptr.3d 808, 263 P.3d 1 (2011), quoting *People v. Burgener*, 29 Cal.4th 833, 869, 129 Cal.Rptr.2d 747, 62 P.3d 1 (2003) (" 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible' ").

### 8. References to the Television Show "Dexter"

{¶ 141} Knuff complains that references to the television show "Dexter" during the trial amounted to the admission of improper character evidence.

{¶ 142} Detective Sloan testified without objection that during his investigation, he learned that Knuff enjoyed the television series "Dexter." He explained: "Dexter is a main character from a television series[.] Dexter is actually a blood stain analysis expert who was a serial killer who dismembers his victims. I guess you could call him a vigilante serial killer."

**{¶ 143}** Later, during Tommy's testimony, the prosecutor asked: "When [Knuff] initially told you what happened and started telling you about getting rid of the body or the body parts, did he mention a TV show?" A defense objection to this question was overruled. Tommy testified: "He would talk about the show Dexter, but I don't think he ever * * * made the connections between the two, why he wanted to do it. * * * I just always thought that's where he got the idea from was talking about Dexter all the time." Tommy testified that Knuff had talked about the show often and that Knuff had said he liked the show a lot.

**{¶ 144}** Knuff argues that these references implied that he "is a serial killer just like the main character" in that show. But while the relevance of the references to "Dexter" during the testimonies of Sergeant Dunbar and Tommy is questionable—the only connection seems to be Tommy's speculation about where Knuff got the idea about dismembering the bodies of Mann and Capobianco—the references to the television show were not prejudicial to Knuff at trial. That Knuff liked "Dexter" does not imply that he is a serial killer; indeed, it does not reflect on his character at all. Any prejudice would stem not from his liking "Dexter" but from his considering dismembering Mann's and Capobianco's bodies, which was relevant to show his consciousness of guilt.

**{¶ 145}** Knuff's challenges to the trial court's admission of character evidence are not well-taken. Accordingly, we reject Knuff's second proposition of law.

### H. Proposition of Law No. III: Reference to Polygraph Examination

**{¶ 146}** In his third proposition of law, Knuff complains that the trial court denied his motion for a mistrial after the jury heard his video-recorded interrogation containing a reference to the results of a polygraph examination.

**{¶ 147}** The complete interrogation was produced as state's exhibit No. 1382 (which was not played at trial and is not in the record). Before trial, the prosecution produced a version of state's exhibit No. 1382 from which several

references to a polygraph examination had been redacted. The result was state's exhibit No. 1382-A, a video recording of the second part of the June 30, 2017 police interrogation of Knuff, which was played in open court. The state neglected to redact from this video the following statement that Detective Wittasek made to Knuff: "This machine says that you had—had stabbed John."[4]

{¶ 148} After state's exhibit No. 1382-A was played for the jury, some off-the-record discussion took place between counsel and the trial court, which appears to have included an objection by defense counsel. The exhibit was then replayed outside the jury's presence, following which the trial court ordered that the statement regarding the "machine" be redacted from the video.

{¶ 149} Defense counsel moved for a mistrial. The trial-court judge noted that she had "been watching the jury very carefully" while the video played and that she "did not note any change in anyone's demeanor" when the contested portion was played. She also remarked on the difficulty she had had in being able to hear the word "machine," stating that she did not even know it had been said until it was pointed out to her by counsel. Defense counsel did not request, and the trial court did not give, a curative instruction to the jury to disregard the challenged statement. The state produced a new copy of the interview, state's exhibit No. 1382-B, from which the offending statement had been redacted. State's exhibit No. 1382-B was submitted to the jury instead of exhibit No. 1382-A.

{¶ 150} Knuff contends that the trial court erred in denying his motion for a mistrial. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). "The granting or denial of a motion for mistrial rests in the sound

---

4. In his merit brief, Knuff misquotes the detective as saying, "[T]his machine says you killed John."

discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

{¶ 151} As Knuff points out, polygraph results are inadmissible unless the parties stipulate to their admission, *State v. Souel*, 53 Ohio St.2d 123, 132-133, 372 N.E.2d 1318 (1978). But Detective Wittasek did not expressly refer to a polygraph examination or a lie-detector machine; he spoke only of a "machine." The state argues that this word choice did not clearly refer to a polygraph examination. Indeed, the state proposes that the jury may have taken it as a reference to scientific testing done by the medical examiner, inasmuch as the detectives had been discussing the autopsy results with Knuff shortly before the statement was made about the "machine."

{¶ 152} Courts generally do not treat unclear references to polygraph examinations as severely as express references; unclear references are seldom deemed to create reversible error. In *Henley v. Cason*, 154 Fed.Appx. 445 (6th Cir.2005), a prosecutor repeatedly referred to "testing" and "investigative procedures," and on appeal, the defendant argued that these references were "thinly veiled references to a polygraph test." *Id.* at 446. However, "the prosecutor never used the term 'polygraph test.' " *Id.* On federal habeas review, the Sixth Circuit rejected as "too attenuated" the inference that "the jury understood that a polygraph [examination had been] administered." *Id.* Additionally, only "a handful" of such references were made during the two-week trial. *Id.*; *see also Neal v. Commonwealth*, 95 S.W.3d 843, 849 (Ky.2003) ("The word polygraph was never mentioned," and "the vague reference to an 'expert interrogator' " did not affect the jury's deliberations). *Compare People v. Mason*, 274 Ill.App.3d 715, 724-725, 653 N.E.2d 1371 (1995) (conviction reversed based on prosecutor's "signal[ing] to the jury that the defendant had failed a polygraph examination"; testimony by four state witnesses established that the defendant had been taken to the police crime laboratory, where he spoke with a "technician" or "examiner," and after learning

"the results of those conversations," changed his story, and the prosecutor referred to these facts in his opening statement and closing argument).

**{¶ 153}** Here, the unidentified "machine" "said" that Knuff "had stabbed John," not that Knuff had lied. The reference Detective Wittasek made to "[t]his machine" was brief and isolated. And the prosecutor said nothing during the trial that could be construed as referring to a polygraph examination.

**{¶ 154}** Finally, the trial court observed that no juror had reacted to the "machine" reference. *See State v. Hawkins*, 326 Md. 270, 278, 604 A.2d 489 (1992) (explaining that the "[trial] judge has his finger on the pulse of the trial" and is in the best position to discern "the reaction of the jurors" to inadmissible references to a polygraph).

**{¶ 155}** Considering all the circumstances, the trial court did not abuse its discretion in declining to declare a mistrial and finding that the statement about a "machine" that was made in the videotaped interrogation of Knuff did not render a fair trial impossible. We therefore reject Knuff's third proposition of law.

### I. Proposition of Law No. IV: Improper Opinion Testimony

**{¶ 156}** Knuff contends in his fourth proposition of law that he was denied a fair trial because the state improperly elicited opinion testimony from its witnesses about the credibility of other witnesses and about the credibility of Knuff (who did not testify at trial but whose out-of-court statements were admitted into evidence).

**{¶ 157}** " 'In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.' " *State v. Boston*, 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988) (Brown, J., concurring). Witnesses, whether experts or laymen, may not testify regarding their opinions on the credibility of other witnesses, because that infringes on the domain of the trier of fact. *See State v. Davis*, 116 Ohio St.3d 404, 2008-

Ohio-2, 880 N.E.2d 31, ¶ 122-123 (a police officer's opinion that an accused was being untruthful when interviewed is inadmissible).

{¶ 158} Knuff contends that two of the state's witnesses, Stoner and Parma Heights Police Captain Steve Scharschmidt, improperly opined on the credibility of other witnesses.

### 1.  Alicia Stoner

{¶ 159} On redirect examination, Stoner testified that when the police interviewed her on June 23, 2017, she told them that she believed Knuff's account of what had happened at 6209 Nelwood Road because she was unaware of any contradictory information.  But she testified that when she talked to the police again, she told them that "the information that [Knuff had] provided didn't seem congruent or didn't seem necessarily absolute."  Stoner testified, "As I started thinking back over things, that's where I doubted what he had told me."  Defense counsel's objections to this testimony were overruled.

{¶ 160} The state argues that Stoner's testimony was admissible because she never actually said that Knuff was lying; she said only that she had begun to doubt what he had told her.  This is a distinction without a difference.  But we find that any error in the trial court's admitting Stoner's testimony in this regard was harmless beyond a reasonable doubt.

{¶ 161} First, as the state points out, the record contains abundant, properly admitted evidence showing that Knuff lied to several people about the killings of Mann and Capobianco.  Second, Stoner was merely a lay witness, not a police officer or expert, and although it is true that the rule against witnesses opining on the credibility of others applies equally to lay witnesses, a jury would be less likely to give Stoner's opinion any special weight.

### 2.  Parma Heights Police Captain Steve Scharschmidt

{¶ 162} Knuff also claims that the state impermissibly elicited testimony from Captain Scharschmidt about the truthfulness of Stoner and of Knuff's son,

Tommy. Because defense counsel did not object to this testimony at trial, Knuff has waived all but plain error.

{¶ 163} Captain Scharschmidt participated in the police interviews of Stoner. On direct examination, the prosecutor asked him whether he had arranged for Stoner to return for further questioning after her first interview. Captain Scharschmidt's answer included this statement: "We did feel that she was being somewhat evasive and we weren't getting the truth, so we did then talk to her several times in the near future."

{¶ 164} Knuff's paraphrase in his merit brief of Captain Scharschmidt's testimony—"[Knuff] is lying and therefore he is guilty"—is misleading. Knuff does not identify any testimony by Captain Scharschmidt in which the captain stated or even implied that *Knuff* was lying or guilty. He said only that *Stoner* was "evasive," and he did not specify what Stoner had said that he thought was evasive.

{¶ 165} The state argues that Captain Scharschmidt's testimony was permissible because it explained why officers chose to speak to Stoner again later. But the state fails to elucidate why any such explanation was needed.

{¶ 166} Nonetheless, the trial court's admission of Captain Scharschmidt's testimony does not reach the level of plain error. Stoner herself testified that she had not told officers the entire truth during her first interview. Captain Scharschmidt's statement that Stoner had seemed "evasive" was cumulative of this testimony and added little or nothing to the state's case. Knuff has not demonstrated that the outcome of the trial would have been different had Captain Scharschmidt's testimony been excluded.

{¶ 167} Knuff's counsel did object to Captain Scharschmidt's testimony regarding Tommy's truthfulness. The prosecutor asked the captain: "[W]ere there times that [Tommy] was being less truthful than other times?" Defense counsel objected to the question, but Captain Scharschmidt answered, "Yes," before the

trial court sustained the objection. Defense counsel did not ask the court to strike Captain Scharschmidt's answer or give a curative instruction to the jury.

{¶ 168} In this instance, the error was harmless beyond a reasonable doubt. As was true when he testified regarding Stoner's interviews, when Captain Scharschmidt testified regarding Tommy's interviews, he did not identify any particular statements that Tommy had made that he thought were "less truthful than" other statements that he had made. And like Stoner, Tommy admitted on the witness stand that he had lied to the police, so Captain Scharschmidt's testimony that at times Tommy was "less truthful than at other times" was cumulative.

### 3. Parma Heights Police Detective Luke Wittasek

{¶ 169} Knuff reiterates his complaint about Detective Wittasek's polygraph reference in the videotaped interrogation that was played for the jury (see discussion of third proposition of law above), recasting it as "improper opinion testimony regarding Knuff's credibility." We reject this claim. To the extent Detective Wittasek's statement can be characterized as opinion testimony, as discussed above, the trial court did not abuse its discretion in denying defense counsel's motion for a mistrial after the statement was heard by the jury.

{¶ 170} Knuff's fourth proposition of law is rejected.

### J. Proposition of Law No. V: Gruesome Autopsy Photos

{¶ 171} In his fifth proposition of law, Knuff contends that the admission of gruesome autopsy photographs of the victims denied him a fair trial.

{¶ 172} Admission of photographs is within "the sound discretion of the trial court." *State v. Johnson*, 88 Ohio St.3d 95, 117, 723 N.E.2d 1054 (2000). A photograph is not inadmissible merely because it is gruesome. *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 101.

> "Properly authenticated photographs, even if gruesome, are
> admissible in a capital prosecution if relevant and of probative

value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number."

*Id.*, quoting *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus.

{¶ 173} The trial court admitted 57 autopsy photographs: state's exhibit Nos. 5 through 33 (of Capobianco's autopsy) and Nos. 39 through 66 (of Mann's autopsy). Of these, three photographs are clearly not gruesome: exhibit Nos. 5 and 38 depict closed body bags without revealing their contents and exhibit No. 15 shows Capobianco's upper denture after it was removed and cleaned. Exhibit Nos. 6, 8, and 39 are also not gruesome: they show very little of the victims' bodies, although some discolored flesh can be seen in each.

{¶ 174} The remaining 51 photographs are gruesome, because they show the extensive decomposition of Mann's and Capobianco's bodies. However, the relevance of these photographs is clear: the fact of decomposition itself was relevant. It explained why the victims' flesh showed some disruptions (breaks in the skin that could have been caused by decomposition rather than a wound), why the medical examiner was unable to determine whether the disruptions were stab wounds, and why the medical examiner was unable to swab under the victims' fingernails. The photographs illustrated the medical examiner's testimony, documented her handling of the bodies, and showed the victims' numerous stab wounds. *See, e.g.*, *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 145 (admission of gruesome autopsy photographs was not plain error when they "depicted the victim's wounds, illustrated the coroner's testimony, and helped prove [McKnight's] intent").

**{¶ 175}** The photographs at issue here were not repetitive or cumulative. Each wound was generally depicted twice: once from a distance to show the wound's location on the body and once close-up to show its characteristics. And each body was photographed several times from different angles. Thus, each photograph has probative value that the others do not.

**{¶ 176}** Although 51 gruesome photographs were admitted into evidence, each was relevant and each possessed unique probative value. Against this backdrop, we hold that the trial court did not abuse its discretion in deciding that the probative value of each photograph outweighed any prejudicial effect and that any repetition in the photographs did not materially prejudice Knuff.

**{¶ 177}** Accordingly, we reject Knuff's fifth proposition of law.

### K. Proposition of Law No. XVII: Jury Instructions

**{¶ 178}** In his 17th proposition of law, Knuff contends that the trial court gave erroneous jury instructions. He complains that the trial court erroneously (1) denied his request for a jury instruction on voluntary manslaughter as an "inferior degree offense" of aggravated murder and murder, (2) instructed the jury that attempted concealment of a crime may tend to indicate consciousness of guilt, and (3) instructed the jury that Knuff, who claimed to have killed Capobianco in self-defense, may have had a duty to retreat. Knuff's first two arguments lack merit. The trial court's duty-to-retreat instruction was erroneous, but under the circumstances, we hold that the error was harmless.

#### 1. Denial of Knuff's Request for a Voluntary-Manslaughter Instruction

**{¶ 179}** Knuff contends that the jury should have been instructed on voluntary manslaughter as an inferior-degree offense of aggravated murder. According to Knuff, the trial court violated the Eighth and Fourteenth Amendments to the United States Constitution by declining to give this instruction.

**{¶ 180}** In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the United States Supreme Court struck down an Alabama law that

prohibited trial courts from instructing a jury on lesser included offenses in capital cases. The Supreme Court explained:

> [O]n the one hand, the unavailability * * * of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason—that, whatever his crime, the defendant does not deserve death.

*Id.* at 642-643. The court concluded that the "level of uncertainty and unreliability" introduced by the two possibilities "cannot be tolerated in a capital case." *Id.* at 643.

{¶ 181} Knuff's claim with respect to the Eighth Amendment fails because although the jury was not instructed on voluntary manslaughter, it was instructed on the lesser included offense of murder. "As long as the jury is instructed on *some* lesser offense that is supported by the evidence, the Constitution is satisfied." (Emphasis sic.) *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 244.

{¶ 182} Nevertheless, "[r]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *Id.* at ¶ 240. We review a trial court's refusal to give a requested jury instruction for an abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

{¶ 183} "[A] judge is to give instructions on lesser-included and inferior-degree offenses only when the evidence would allow a jury to reasonably reject the

greater offense and find the defendant guilty on the lesser-included or inferior-degree offenses." *State v. Lloyd*, 171 Ohio St.3d 353, 2022-Ohio-4259, 218 N.E.3d 737, ¶ 26. Knuff contends that the jury should have been instructed on voluntary manslaughter, which is an offense of inferior degree to aggravated murder, *State v. Tyler*, 50 Ohio St.3d 24, 36, 553 N.E.2d 576 (1990). Voluntary manslaughter occurs when a person knowingly causes the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the [offender] into using deadly force." R.C. 2903.03(A).

{¶ 184} Whether a voluntary-manslaughter instruction should be given requires consideration of both an objective and a subjective factor. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 153. The objective factor requires determining whether a serious provocation occurred and whether that provocation was "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992). And the subjective factor requires evaluating whether "this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634.

{¶ 185} Knuff was not entitled to a voluntary-manslaughter instruction, because no evidence was presented to show that he actually was under the influence of sudden passion or in a sudden fit of rage when he committed the murders for which he was convicted. No evidence was presented at trial that he had become enraged because Capobianco had assaulted him or that he had acted in a fit of rage when he killed Mann and Capobianco. True, Knuff told police in his interrogations that he was afraid of Capobianco. But "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998). *Accord Thompson*

at ¶ 157.  Thus, the trial court did not abuse its discretion when it declined to give a voluntary-manslaughter jury instruction.

### 2. Consciousness-of-Guilt Jury Instruction

{¶ 186} Knuff also argues that the trial court should not have instructed the jury on consciousness of guilt.  The court instructed the jury as follows: "Testimony has been admitted indicating that the Defendant attempted to conceal a crime.  You are instructed that the Defendant's actions in attempting to conceal a crime do not raise a presumption of guilt, but may tend to indicate the Defendant's consciousness or awareness of guilt."  The court further instructed the jury that if it found that Knuff had tried to conceal a crime and that he had been motivated by consciousness of guilt, it could then consider that evidence in deciding whether Knuff was guilty of the crimes with which he had been charged.

{¶ 187} At trial, Knuff's counsel objected to this instruction without explaining the basis for the objection.  On appeal, Knuff asserts, without discussion or analysis, that "the evidence in the record did not support a consciousness of guilt instruction."  But the state did adduce evidence that Knuff attempted to conceal a crime: he tried to clean up the crime scene; he lied repeatedly about how he had injured his finger; and he wrote a letter asking his friend to burn down the house where the murders had taken place, gave that letter to Stoner, and instructed her to deliver the letter to Dlugo.  In light of this ample evidence, the trial court did not abuse its discretion in giving the consciousness-of-guilt jury instruction.

### 3. Duty-to-Retreat Jury Instruction

{¶ 188} Next, Knuff takes issue with the trial court's jury instruction regarding self-defense.  At trial, Knuff maintained that he had killed Capobianco in self-defense.  The trial court accordingly gave a self-defense instruction on Count Nos. 1 and 2 (aggravated murder of Capobianco).  Over defense counsel's objection, the trial court's instruction included this language:

> Duty to retreat. The Defendant had no duty to retreat unless he was at fault in creating the situation giving rise to the death of Regina Capobianco.

{¶ 189} Knuff contends that the duty-to-retreat instruction was in error. We agree. But as discussed below, we conclude that the error was harmless beyond a reasonable doubt.

### a. The trial court's duty-to-retreat jury instruction was in error

{¶ 190} R.C. 2901.05(B) codifies a person's right to use force in self-defense and places the burden on the state to "prove beyond a reasonable doubt that the accused person did not use the force in self-defense."

{¶ 191} The elements of a self-defense claim are

> "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."

(Brackets sic.) *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Because each element must exist for a self-defense claim to prevail, the state can defeat a self-defense claim by disproving any one of these elements beyond a reasonable doubt. *See State v. Walker*, 8th Dist. Cuyahoga. No. 109328, 2021-Ohio-2037, ¶ 13 (citing cases); 3 Katz, Giannelli, Lipton & Crocker, *Criminal Law*, Section 88:13, at 5 (3d Ed.2009, Supp.2022).

{¶ 192} Former R.C. 2901.09, Ohio's "castle doctrine" statute, enacted in 2008, created an exception to the duty to retreat, *State v. Carosiello*, 7th Dist. Columbiana No. 15 CO 0017, 2017-Ohio-8160, ¶ 18. When this case was tried,[5] R.C. 2901.09(B) provided:

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence * * *.

2008 Sub.S.B. No. 184.

{¶ 193} The state concedes that the house at 6209 Nelwood Road was Knuff's residence. Its argument is that a defendant may not rely on the castle doctrine if he was at fault in creating the situation in which he ultimately used force in self-defense. Therefore, the state reasons, the duty to retreat remains. To require a defendant who seeks to rely on the castle doctrine to prove that he was not at fault in creating the situation would be to create a judge-made addition to the statute—something we decline to do. Under the plain terms of R.C. 2901.09, Knuff had no duty to retreat while in his residence. The trial court's duty-to-retreat jury instruction was given in error.

*b. The trial court's error in giving a duty-to-retreat jury instruction was harmless*

{¶ 194} Having determined that the trial court erred when it instructed the jury on the duty to retreat, we must evaluate whether the error was harmless. *See*

---

5. Effective April 6, 2021, R.C. 2901.09 provides that a person does not have a duty to retreat before using force in self-defense if the person using force "is in a place in which the person lawfully has a right to be," 2020 Am.S.B. No. 175—expanding the provision from a "castle doctrine" provision to a "stand your ground" provision. This expansion took effect after Knuff's trial, and, in any event, it would not affect our analysis in the instant case.

Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"). We conclude that it was.

{¶ 195} The linchpin of Knuff's self-defense claim was that he killed Capobianco in self-defense after she killed Mann. The jury rejected this version of events when it found that Knuff was guilty of Mann's aggravated murder (a finding that was untainted by the trial court's erroneous duty-to-retreat jury instruction), and at that point, Knuff's self-defense claim collapsed and whether he had a duty to retreat was irrelevant.

{¶ 196} Moreover, the trial court's error was harmless for a second reason. Fault (or the lack thereof) is, on its own, an element of a self-defense claim. *Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, at ¶ 14. To prevail on a self-defense claim, the defendant must not be at fault in creating the situation. *Id.* Therefore, if the jury found beyond a reasonable doubt that Knuff was at fault in creating the situation, it could not acquit Knuff on self-defense grounds *regardless of whether he had a duty to retreat*. In other words, the addition of "defendant-at-fault" language to the duty-to-retreat instruction merely duplicated a necessary element of any self-defense claim. It could not prejudice Knuff.

{¶ 197} Thus, we conclude that the trial court's error in giving the jury a duty-to-retreat instruction was harmless beyond a reasonable doubt, and we reject Knuff's 17th proposition of law.

## L. Proposition of Law No. XVIII: Sufficiency and Weight of the Evidence

{¶ 198} In his 18th proposition of law, Knuff contends that the jury's finding of guilt for the aggravated-murder counts, felony-murder specifications, and underlying felony offenses was based on insufficient evidence and that his convictions for those offenses were against the manifest weight of the evidence. We disagree.

### 1. Sufficiency of the Evidence

**{¶ 199}** A sufficiency-of-the-evidence challenge fails if " 'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 57, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 684 N.E.2d 668 (1997), fn. 4. Viewed in the light most favorable to the prosecution, the evidence in this case is sufficient to allow a reasonable jury to find Knuff guilty of committing the aggravated murders of Mann and Capobianco.

**{¶ 200}** Knuff contends that his convictions on the aggravated-murder counts requiring prior calculation and design (Counts 1 and 3) should be reversed because there was insufficient evidence of prior calculation and design. As the state points out, those counts were merged with Counts 2 and 4, charging felony murder, and the state elected to proceed to sentencing on Counts 2 and 4, so Knuff was never sentenced on Counts 1 and 3. Knuff's claim regarding prior calculation and design is therefore moot.

**{¶ 201}** Knuff further contends that the state failed to prove the felony offenses underlying the felony-murder specifications: aggravated burglary, aggravated robbery, and kidnapping.

**{¶ 202}** As to aggravated burglary, Knuff contends that he should not have been found guilty of that offense, because he had Mann's permission to be on the premises at 6209 Nelwood Road. However, "a [person] who initially gains entry to one's home by consent may subsequently become a trespasser if consent is withdrawn. [And] * * * a jury could justifiably infer from the facts that a victim terminated the accused's privilege to remain after commencement of an assault." *State v. Holloway*, 38 Ohio St.3d 239, 243, 527 N.E.2d 831 (1988), citing *State v.*

*Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987); *see also State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 184-185.

{¶ 203} Regarding the charge of aggravated robbery, the jury acquitted Knuff of the aggravated-robbery count and all four death specifications predicated on aggravated robbery. So Knuff's insufficient-evidence claim with respect to the aggravated-robbery count is moot.

{¶ 204} With regard to the kidnapping charges, Knuff contends that the evidence of his having restrained Mann and Capobianco was insufficient because the state failed to prove that there was any restraint other than what was incidental to the murders. Knuff admitted to police that he held Capobianco down while stabbing her, and the state cited that admission in support of the restraint element necessary to prove the kidnapping charge and specification. With regard to the charges related to Knuff's kidnapping of Mann, the state argued: "To stab somebody 15 times, you have to be restraining their liberty."

{¶ 205} Knuff's argument is not actually a sufficiency-of-the-evidence argument; rather, it is a claim that aggravated murder and kidnapping are allied offenses of similar import that should have been merged in this case. However, this claim fails because "felony-murder under R.C. 2903.01(B) is not an allied offense of similar import to the underlying felony," *State v. Keene*, 81 Ohio St.3d 646, 668, 693 N.E.2d 246 (1998).

{¶ 206} Finally, Knuff contends that the evidence was legally insufficient to *disprove* the elements of self-defense. However, this court recently held that "the state's rebuttal of a defendant's claim of self-defense" is not "subject to review under the sufficiency-of-the-evidence standard." *Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, at ¶ 1.

### 2. *Manifest Weight of the Evidence*

{¶ 207} A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it. *State v. Robinson*, 162 Ohio St. 486,

487, 124 N.E.2d 148 (1955). The reviewing court must determine in view of the entire record " 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). But a new trial is warranted only " 'in the exceptional case in which the evidence weighs heavily against conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 208} Although Knuff's self-defense claim is not subject to review for sufficiency of the evidence, "[t]he state's * * * burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal," *Messenger* at ¶ 27.

{¶ 209} Here, the jury did not lose its way and create a manifest miscarriage of justice. To the contrary, the evidence (other than Knuff's self-serving account) strongly supports the jury's rejection of Knuff's self-defense claim and its finding that he killed both Mann and Capobianco.

{¶ 210} Begin with the autopsies. Mann had downward-oriented stab wounds in his neck, score marks on the top of his skull, and other head wounds. His injuries support the inference that he and his killer were similar in stature. Evidence from the autopsies (and the testimonies of Detective Sloan and the medical examiner), however, establishes a significant disparity in height between Mann and Capobianco, with Mann being roughly a foot taller than Capobianco. In contrast, Knuff, like Mann, was five feet, eleven inches tall. The jury could have reasonably inferred that Knuff—not the diminutive Capobianco—was responsible for Mann's injuries. And Capobianco had two stab wounds in her back, which tends to disprove that Knuff acted in self-defense when he was stabbing her.

{¶ 211} Knuff's actions after the killings also strongly suggest his consciousness of guilt. He cut the bloodstained living-room carpet into numerous

pieces and placed them in garbage bags. Evidence of smeared bloodstains on a wall and the ceiling indicate that Knuff had wiped those areas in an attempt to clean up the crime scene. An unusual late-evening water-usage spike on May 11 at 6209 Nelwood Road was documented by the Cleveland Division of Water. And two bloodstained mops were found in the kitchen. Knuff admitted to police that he had wiped the walls. He dragged the bodies into the bedroom and covered them. He bought hacksaws for the stated purpose of cutting up the bodies (although he did not follow through on this).

{¶ 212} Knuff refused to seek medical attention for his finger that was severely wounded on the night of the murders. He tried to get his sister or Stoner to stitch it up for him, but they both refused. He also lied repeatedly to his son and to his friends about how he had injured his finger.

{¶ 213} Finally, he wrote to his friend Dlugo, urging him to burn down the house at 6209 Nelwood Road to destroy evidence that he said would result in a life sentence for him. He instructed Stoner to deliver the letter to Dlugo and to obtain kerosene for Dlugo to use in burning the house down.

{¶ 214} This is not the rare case in which the jury lost its way and returned a verdict against the manifest weight of the evidence. To the contrary, the jury's verdict was consistent with the evidence admitted at trial. We therefore reject Knuff's 18th proposition of law.

## M. Proposition of Law No. XII: Merger

{¶ 215} Knuff was convicted of three aggravating specifications for each aggravated-murder count: one course-of-conduct specification, R.C. 2929.04(A)(5), and two felony-murder specifications, R.C. 2929.04(A)(7), one of which was predicated on aggravated burglary and the other predicated on kidnapping. In his 12th proposition of law, Knuff contends that the trial court erred by failing to merge the three aggravating specifications into one for purposes of sentencing.

**{¶ 216}** "Merger of capital specifications is required 'where two or more aggravating circumstances arise from the same act or indivisible course of conduct.' " *McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, at ¶ 191, quoting *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph five of the syllabus.

### 1. The Course-of-Conduct Specification Does Not Merge

**{¶ 217}** The course-of-conduct specification does not merge with either of the felony-murder specifications. This court has "repeatedly held that 'specifications for multiple-murder [i.e., course of conduct] and for felony-murder represent distinct and separate aggravating circumstances,' " that those specifications are "not duplicative," and that they "do not merge." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 175, quoting *Smith*, 80 Ohio St.3d at 116, 684 N.E.2d 668. *Accord McAlpin* at ¶ 191.

### 2. The Aggravated-Burglary and Kidnapping Specifications Merge

**{¶ 218}** The question remains whether the aggravated-burglary and kidnapping specifications merge. Knuff failed to request merger at trial, so our review is limited to plain error. *See, e.g.*, *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 137.

**{¶ 219}** To determine whether specifications for aggravating circumstances merge, we use the same test that we use for determining whether two offenses merge as allied offenses of similar import. *See, e.g.*, *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 128-129. Offenses do not merge if "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25.

**{¶ 220}** Under the facts of this case, none of the foregoing factors is present. First, although aggravated burglary and kidnapping do not inherently cause the

same harm, in this case they did—the murders of Mann and Capobianco. Thus, the aggravated burglary and kidnappings were not "dissimilar in import or significance," *id*.

{¶ 221} Second, the record contains no apparent evidence that the kidnappings were committed separately from the aggravated burglary. Because Knuff had permission to be in the house at 6209 Nelwood Road, an aggravated-burglary charge can be sustained only on the theory that his permission to be there automatically terminated once he assaulted Mann or Capobianco, converting his presence into a trespass by force. *See Holloway*, 38 Ohio St.3d at 243, 527 N.E.2d 831. Likewise, as the state's closing arguments in both phases of the trial demonstrate, Knuff's kidnapping convictions rest on the inference that he must have restrained both Mann and Capobianco while he was killing them. Since both the aggravated-burglary and the kidnapping counts rely on the *same* acts of assault and murder, it cannot be said that the kidnappings and aggravated burglary were committed separately.

{¶ 222} Finally, there is no evidence that the kidnappings and the aggravated burglary were committed with distinct animus or motivation. Knuff's intention to murder Mann and Capobianco supplied the mens rea for the aggravated-burglary charges and the motivation for restraining the victims while he killed them. Thus, the aggravated-burglary and kidnapping specifications should have been merged.

{¶ 223} We have held that a reviewing court may apply the doctrine of merger to correct a trial court's erroneous failure to merge specifications. *State v. Cook*, 65 Ohio St.3d 516, 528, 605 N.E.2d 70 (1992), citing *Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, at paragraph five of the syllabus. After merging the specifications, "the reviewing court * * * may uphold the sentence if it determines beyond a reasonable doubt that the remaining aggravating circumstances outweigh

the mitigating factors, and the jury's consideration of duplicative specifications did not affect its verdict." *Cook* at 528.

{¶ 224} Reversal of Knuff's sentence is unnecessary because we are able to modify his sentence by merging the aggravated-burglary and kidnapping specifications during our independent review, thus curing the trial court's failure to merge them at trial.

{¶ 225} We therefore reject Knuff's 12th proposition of law.

### N.  Proposition of Law No. XVI: Sentencing Issues

{¶ 226} In his 16th proposition of law, Knuff contends that during the penalty phase, the trial court admitted irrelevant or unfairly prejudicial and inflammatory other-acts evidence about his alleged preparations to escape from jail.

{¶ 227} After the defense rested in the penalty phase, the state called a rebuttal witness, Detective Joe Goudy of the Cuyahoga County Sheriff's Department, who investigates crimes committed in the county jail.  (Knuff was housed there during the trial.)  Detective Goudy testified that on December 16, 2017, he searched Knuff's cell for contraband and found three detailed, full-color replicas of the sheriff's stars worn by correctional staff, which were hand drawn on white fabric stretched over pieces of cardboard shaped to look like sheriff's badges. Detective Goudy testified that some jail staff wear shirts with a sewn-on fabric star instead of a metal badge and that Knuff's homemade stars would look similar to the real ones "from a distance" or when viewed on a security-camera image.

{¶ 228} Detective Goudy also found a plastic eyeglass lens that had been sharpened to a fine point, a brown bedsheet fashioned into a shirt resembling a smock worn by nursing assistants in the jail, three homemade patches with the word "sanitation" on them, several makeshift spools of thread, several fine-point colored markers concealed in a hollow Bible, and a mask made from a shirtsleeve. Photographs of the items were admitted into evidence.

**{¶ 229}** Defense counsel objected to the admission of this evidence. The state argued that this evidence showed that Knuff was planning to escape from the county jail and that these plans were relevant to refute Knuff's repeated declarations of "remorse" in his unsworn statement. The trial court overruled the objection and instructed the jury not to consider the rebuttal testimony of Detective Goudy "as an aggravating circumstance" but "only as [it] relates to the history, character, and background of the defendant in mitigation."

**{¶ 230}** Knuff argues that the jail-break-preparation evidence should have been excluded as irrelevant because his preparations took place after the murders. But he cites no authority in support of his claim that events that occurred after the murders for which he was found guilty are inherently irrelevant to capital sentencing.

**{¶ 231}** Knuff also argues that admitting the jail-break-preparation evidence violated former Evid.R. 404(B): "Evidence of other crimes * * * is not admissible to prove the character of a person in order to show action in conformity therewith." But the jail-break-preparation evidence was not used to show that Knuff had any particular character trait or that he took any action in conformity with his character.

**{¶ 232}** Finally, Knuff contends that the jail-break-preparation evidence "did not bear on any mitigating factors raised and presented by the defense." *See generally State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995), syllabus (prosecution may introduce "evidence rebutting the existence of any * * * mitigating factors first asserted by the defendant"), *holding modified on other grounds by State v. Wogenstahl*, 75 Ohio St.3d 344, 356, 662 N.E.2d 311 (1996). This is not so. As the state points out, in Knuff's unsworn statement, he repeatedly proclaimed his remorse—not for the murders, which he still denied being responsible for, but for the effects of his actions on Stoner and on his son. He also said he felt guilty because he had suggested to Mann that Mann remove Capobianco

from his home. He claimed he was sorry for letting the victims' bodies stay concealed in the house, an action he described as "horrific," and for depriving the victims' families of being able to have a proper funeral for Mann and Capobianco. And according to his statement, he felt bad that he had lied about stealing Mann's car.

**{¶ 233}** Preparing to break out of pretrial confinement may reasonably be construed as trying to evade responsibility for one's actions. Evading responsibility tends to call into question the sincerity and depth of claimed remorse. *See, e.g.*, *State v. Wiles*, 59 Ohio St.3d 71, 93-94, 571 N.E.2d 97 (1991) (remorse offset by offender's attempts to avoid responsibility, including fleeing the state); *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 274 (sincerity of remorse questionable considering that offender concocted false story blaming victim). Notably, the state did not argue that Knuff's escape preparations were aggravating circumstances, and the trial court instructed the jury not to consider them as such. The trial court did not abuse its discretion when it admitted the jail-break-preparation evidence so that the jury could determine what evidentiary weight it deserved.

**{¶ 234}** We deny Knuff's 16th proposition of law.

### O. Proposition of Law No. XI: Prosecutorial Misconduct

**{¶ 235}** In his 11th proposition of law, Knuff alleges that prosecutorial misconduct in both the guilt and penalty phases denied him a fair trial. The conduct Knuff complains of either did not amount to misconduct, was harmless beyond a reasonable doubt, or—for the alleged misconduct that Knuff failed to object to at trial—did not constitute plain error.

### 1. Guilt Phase

*Irrelevant testimony*

**{¶ 236}** Knuff argues that the state committed prosecutorial misconduct by soliciting irrelevant testimony. He reiterates claims of evidentiary error that he

asserted in his second, third, and fourth propositions of law, which we resolved above. "At bottom, these arguments are evidentiary claims." *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 114. "[I]t is not prosecutorial misconduct to introduce evidence that the trial court has determined to be admissible." *Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, at ¶ 187.

### b. Improper arguments

{¶ 237} According to Knuff, the state committed prosecutorial misconduct during closing arguments by disparaging defense counsel, revealing the prosecutor's personal opinions about Knuff's credibility and character, and including statements intended to inflame the jury's passions.

{¶ 238} We assess prosecutorial misconduct in closing arguments by asking " 'whether the remarks were improper and, if so, whether they prejudicially affected [the] substantial rights of the defendant.' " *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). A conviction may be upheld in the face of a prosecutor's improper remarks when it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" regardless of the comments. *United States v. Hasting*, 461 U.S. 499, 511-512, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (new trial unwarranted despite prosecutor's improper argument because of "overwhelming evidence of guilt and the inconsistency of the scanty evidence tendered by the defendants").

{¶ 239} Applying this test to the comments that Knuff contends were improperly made during the guilt phase of the trial, we determine that viewed as a whole, the prosecutor's closing argument "was fair, did not improperly appeal to the jury's emotion, and did not create prejudicial error," *Hessler* at 125. We address each of the allegedly improper comments below.

i. Improper comments that did not substantially prejudice Knuff

{¶ 240} Some of the prosecutor's comments made during the guilt phase of the trial were improper. However, in the face of the otherwise overwhelming evidence of Knuff's guilt, we find that the instances of prosecutorial misconduct amount to harmless error.

{¶ 241} *Comments about prosecutor's experience.* Knuff alleges that the prosecutor improperly referred to her prosecutorial experience to sway the jury. The prosecutor said: "Let me tell you, *I've been doing this a long time.* And the state of Ohio doesn't bring cases based on speculation, folks." (Emphasis added.) She later said: "There is prior calculation and design here. *No one speculated when we brought this case* to you. *We spent months preparing * * * for this case.*" (Emphasis added.) Both comments were objected to, and both objections were overruled.

{¶ 242} These comments by the prosecutor were improper. A prosecutor may not "invite[] the jury to substitute the prosecutor's experience for its own evaluation." *State v. Waddy*, 63 Ohio St.3d 424, 435-436, 588 N.E.2d 819 (1992). *Accord Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, at ¶ 119.

{¶ 243} *Appeals to consider Knuff's character.* Also improper was a theme in the prosecutor's guilt-phase closing arguments that Knuff manipulated and used Stoner and Tommy. Knuff's counsel failed to object to some of these comments. He did, however, object when the prosecutor said, "Because [Tommy] missed [Knuff's] call once while he was in college, [Knuff] doesn't call him back. * * * *Doesn't that tell you the character* of a human being?" (Emphasis added.) Defense counsel's objection to these comments was overruled. But these comments were improper, because in making them, the prosecutor expressly asked the jury to draw an unfavorable inference about Knuff's character.

{¶ 244} *Comments describing Knuff's behavior as selfish, narcissistic, and antisocial.* Another questionable comment from the prosecutor was that the jury

had "had a master class * * * in selfish, narcissistic, [and] antisocial behavior" just by serving on the jury in Knuff's trial. The trial court sustained defense counsel's objection to this comment, and the trial court later instructed the jury that closing arguments were not evidence. Thus, any error "lacks prejudicial effect warranting reversal." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 94.

{¶ 245} *Questioning the reliability of Knuff's statements.* Also during the guilt-phase closing arguments, the prosecutor posed a rhetorical question to the jury about Knuff's trustworthiness. The prosecutor went through each of the explanations Knuff had given to people, including Stoner, Tommy, Walters, and the investigating law-enforcement officers, about how he had injured his finger. At the end of this recitation, the prosecutor stated: "Which [of Knuff's statements] can you rely on in the most important of your affairs? I submit to you zero." A defense objection was immediately overruled, and later, a motion for mistrial was denied.

{¶ 246} Although the prosecutor's argument that Knuff's statements were unreliable was permissible, his use of the phrase "in the most important of your affairs" was not. This language is included in the definition of "proof beyond a reasonable doubt." *See* R.C. 2901.05(E). The prosecutor's application of that definition to Knuff's statements had the potential to confuse the jury. But we find that the statement was harmless beyond a reasonable doubt because the jury was repeatedly instructed on the correct burden of proof.

{¶ 247} In sum, even though each of the foregoing comments made by the prosecutor during the guilt phase of the trial were improper, the overwhelming evidence of Knuff's guilt is such that even if these comments had not been made, it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty," *Hasting*, 461 U.S. at 511, 103 S.Ct. 1974, 76 L.Ed.2d 96.

ii. Prosecutor's comments that either were not improper or were not plain error

{¶ 248} The remainder of the prosecutor's arguments and comments that Knuff complains about either were not improper or Knuff failed to object to them during the trial and has not established plain error.

{¶ 249} *The television show "Dexter."* One of the challenged comments involves references the prosecutor made to "Dexter," a television show about a serial killer. The prosecutor said, "Knuff buys a hacksaw. * * * Tells his kid about 'Dexter.' What kind of person does that? * * * Cut off their fingertips so they couldn't get DNA. That is a manipulative mind that has a goal to conceal the deaths of these individuals." Defense counsel did not object to these comments when they were made at trial.

{¶ 250} Knuff asserts that these comments "characterize[d him] as 'Dexter.'" The prosecutor's comments focus on relevant evidence, e.g., that Knuff talked about dismembering Mann's and Capobianco's bodies and that he had made preparations to do that for the purpose of concealing their deaths. While the reference to "Dexter" was irrelevant to this purpose, the state's single passing mention of that show did not deny Knuff a fair trial and does not amount to plain error.

{¶ 251} *Lack of remorse.* The prosecutor referred to a letter Knuff had written to his friend Krystal Paserk during his pretrial incarceration in which Knuff discussed different ways of making money after his anticipated release and asked Paserk to "get in touch" with "Dateline and 48 Hours." The prosecutor again used rhetorical questions during guilt-phase closing arguments to make her point, asking who would do such a thing. Answering her own question, she said, "Somebody with no remorse for what they did. That's who." Knuff did not object to this statement by the prosecutor, forfeiting his right to challenge the statement absent plain error. *See* Crim.R. 52(B).

{¶ 252} Ordinarily, a capital defendant's lack of remorse is irrelevant to the issue of guilt. *Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, at

¶ 186; *Wiles*, 59 Ohio St.3d at 87, 571 N.E.2d 97. But Knuff, in service of his self-defense claim, made repeated statements to detectives about how much he liked the victims and how guilty he felt for causing friction between the victims. Knuff's remorse thus "became an issue during the guilt phase of the trial as a result of the strategy employed by the defense," *Wiles* at 87. The prosecutor's questioning the sincerity of Knuff's remorse to undermine his story was not improper. *See id.* Accordingly, these comments by the prosecutor did not amount to plain error.

{¶ 253} *Unsavory character traits.* Knuff argues that the prosecutor committed misconduct by ascribing the following negative character traits to him: cowardice, deceitfulness, and manipulativeness. Each claim of misconduct fails.

{¶ 254} The prosecutor called Knuff a coward because he had covered Capobianco's face after the murder and because he had asked someone else (Dlugo) to burn down the house where the bodies were located. Defense counsel did not object to either of these references to Knuff's cowardliness. Even if counsel had objected, the court would not have erred in overruling the objection, because calling a defendant a coward is "no worse than characterizations we have found permissible in other [capital] cases," *State v. Clemons*, 82 Ohio St.3d 438, 451, 696 N.E.2d 1009 (1998); *see also State v. White*, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998). In this case, using the term to describe Knuff's actions was "a fair commentary on the facts," *Clemons* at 451. *See State v. Tibbitts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001) (use of word "coward" to describe defendant was permissible to highlight prosecutor's theory that defendant was unable to face victim when he killed her).

{¶ 255} Knuff also complains that the prosecutor repeatedly called him a liar. Once again, defense counsel did not object to these comments when they were made at trial. Generally, a prosecutor's calling the defendant a liar is improper. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 171. Yet such comments have been permitted when based on evidence presented at trial. *See*

*id.* Here, the record contains abundant evidence of Knuff's lying. And his credibility, or lack thereof, was central to this case. *See State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 98-99 (prosecutor was entitled to characterize defendant as a liar because the characterization was supported by the evidence and defendant's credibility was central to his insanity defense). Thus, the prosecutor's characterization of Knuff as a liar was "fair comment based on the evidence at trial," *Leonard* at ¶ 171. No plain error occurred.

**{¶ 256}** Finally, the prosecutor repeatedly said that Knuff "manipulates" people, such as his son Tommy and Stoner. Defense counsel did not object to the prosecutor's use of the word "manipulate." What's more, this court has previously rejected a capital defendant's claim that a prosecutor committed misconduct by describing the defendant as manipulative. *Hancock* at ¶ 98-99.

**{¶ 257}** *Use of poetry as a rhetorical device.* Knuff takes issue with the prosecutor's recitation of D.H. Lawrence's poem "All Souls' Day" during the prosecutor's guilt-phase closing arguments. But defense counsel did not object to the recitation when it occurred at the trial. Immediately after the recitation, the prosecutor said:

> Ladies and gentlemen, the affairs of John Mann and Regina Capobianco and the accounting of their deaths are at an end. What you do in the next couple of days is up to you. The effort and time in evaluating all the evidence, the witness testimony, and the exhibits is important. Apply reason and commonsense. The same reason and commonsense that we asked of you when you took your oath to truly try this case.
>
> Keeping in mind that your destination, ladies and gentlemen, is to arrive at the truth. Because only with the truth can John Mann and Regina Capobianco rest in peace.

71

At this point, defense counsel objected, and the objection was overruled.

{¶ 258} Knuff contends that this line of argument was "an improper appeal to the sympathies and passions of the jurors." The use of poetry or literary allusion as a rhetorical device during closing argument is not inherently improper. *See, e.g.*, *State v. Thompson*, 266 Conn. 440, 463-465, 832 A.2d 626 (2003). Although urging a jury to *convict* a defendant so that murder victims may "rest in peace" might be an improper emotional appeal under certain circumstances, that is not what was said here. The prosecutor asked the jury to "arrive at the truth"—not "convict"—"[b]ecause only with the truth [could the victims] rest in peace." Further, an argument stressing evidence and reason as the pathway to the truth, as the prosecutor's argument did here, is not "inflammatory rhetoric" and is unlikely "to provoke a thoughtless emotional response," *People v. Holmes*, 12 Cal.5th 719, 789, 503 P.3d 668 (2022). This is true even when the argument is considered in the context of a D.H. Lawrence poem.

{¶ 259} *Sarcasm.* During guilt-phase closing arguments, the prosecutor employed sarcasm, which Knuff contends was improper. We disagree. The comments in question were neither inflammatory nor abusive and were made in response to sarcastic remarks that were made by Knuff's own counsel. Thus, they were permissible.

{¶ 260} During defense counsel's closing argument, counsel sarcastically questioned the thoroughness of the crime-scene investigation by trumpeting a discovery he made at 6209 Nelwood Road during trial preparation: a knife and a piece of paper underneath a towel on an end table in the living room.

{¶ 261} In the state's final closing, the prosecutor said: "You know, [defense counsel,] our super sleuth over here, * * * thank God he went to the house. * * * Because he had been there several times before and never once looked under the towel." Later, the prosecutor said: "You know, I take umbrage when * * * I

hear sometimes divine intervention or that God came upon the defense attorney that day to just turn over that towel on that table. You take that for what it's worth * * *. I'm not going to speculate on that." Defense counsel did not object to these statements.

{¶ 262} Sarcastic remarks directed at opposing counsel can be "inappropriate and improper." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 383. Yet sarcasm is not necessarily misconduct. "[I]nflammatory" and "purely abusive" comments are impermissible. *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988). But "[o]therwise, counsel for both parties are afforded wide latitude during closing argument." *Id.* That "wide latitude * * * has been held to include some degree of both sarcasm and invective." *People v. Banks*, 237 Ill.2d 154, 183, 934 N.E.2d 435 (2010). And a reviewing court must take defense counsel's own "opening salvo" into account when considering a prosecutor's use of sarcasm. *United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

{¶ 263} Here, the prosecutor's sarcasm was not used to denigrate defense counsel personally but to minimize the significance of the evidence that counsel had found. The remarks were neither inflammatory nor "purely abusive," *Brown* at 317, and they did not deprive Knuff of a fair trial. The prosecutor was also responding in kind to defense counsel's own use of sarcasm. Therefore, the prosecutor's sarcastic remarks were not misconduct.

{¶ 264} No reversible prosecutorial misconduct occurred during the guilt phase of Knuff's trial. Each statement that Knuff cites as an example of prosecutorial misconduct either did not prejudicially affect a substantial right, did not amount to plain error, or did not constitute misconduct.

### 2. Penalty Phase

{¶ 265} With regard to the penalty phase of the trial, Knuff first argues that the prosecutor mischaracterized the guilt-phase testimony relating to Knuff's plan

to dismember the victims' bodies. The prosecutor quoted guilt-phase testimony from Stoner about Knuff's intent to use hacksaws to dismember the bodies and about Stoner's belief that Knuff had partly dismembered the bodies. Contrary to Knuff's claim, the prosecutor did not mischaracterize the evidence or mislead the jury. Knuff's claim has no merit.

{¶ 266} Next, Knuff contends that it was misconduct for the prosecutor to urge the jury to assign "great" or "heavy" weight to the aggravating circumstances and "some," "little," or "minimal" weight to the mitigating circumstances. He objected at trial when the prosecutor made "disparaging" remarks about the unsworn statement that Knuff made in court, including telling the jury to give Knuff's statement no weight. Knuff's arguments here are meritless. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson*, 74 Ohio St.3d 381, 399, 659 N.E.2d 292 (1996); *see also McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, at ¶ 241 (not misconduct for prosecutor to urge jury to give no weight to defendant's unsworn statement).

{¶ 267} Knuff also argues that the prosecutor "misinform[ed] the jury" and made "misstatements of the law" when she told the jury: "You are to consider mitigation that is evidence based. *Evidence that was presented in this courtroom.* * * * Not what's in your belly, folks." (Emphasis added.) An objection by defense counsel was overruled. On appeal, Knuff seems to take particular issue with the prosecutor's words "Evidence that was presented in this courtroom." But he offers no explanation for his challenge to the prosecutor's use of these words, nor does he cite any authority to support his claim that the words were in any way prejudicial to his receiving a fair trial. No error occurred here. The prosecutor's statement—that mitigation is based on evidence presented in court—is consistent with the constitutional requirement that the sentencer must consider "any relevant

mitigating *evidence*," (emphasis added) *Eddings v. Oklahoma*, 455 U.S. 104, 110, 113-114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

{¶ 268} Knuff also accuses the prosecutor of improperly admonishing the jury to consider only the three mitigating factors that defense counsel listed in a PowerPoint presentation during his penalty-phase closing arguments. An objection by defense counsel was overruled. However, at defense counsel's request, the trial court instructed the jury that mitigation was not limited to the three mitigating factors listed in the PowerPoint presentation but included everything that they might consider to be mitigating. Knuff contends this curative instruction was inadequate to cure the alleged error, but he does not explain why. We find that the instruction was clear and definite and adequately cured any error.

{¶ 269} Knuff further complains that the prosecutor described the deaths of Mann and Capobianco as "horrendous" and said, "We don't act like this in a civilized society, folks." Neither statement was improper, however. A prosecutor is free to comment on the nature and circumstances of an offense so long as she does not cite the nature and circumstances of the offense as aggravating circumstances. *Wogenstahl*, 75 Ohio St.3d at 355, 662 N.E.2d 311. And the prosecutor did not do so here.

{¶ 270} Furthermore, we interpret the reference to "a civilized society" as a call for the jury to recommend death to maintain community standards—not to satisfy a societal demand—and such a request is permissible. *See State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986).

{¶ 271} Finally, Knuff criticizes as inflammatory the prosecutor's comments that Knuff's unsworn statement was "pathetic," "embarrassing," and "insulting to the intelligence of every person who heard it." Defense counsel's objections to these comments were overruled. The prosecutor's comments were harsh, but in the context of Knuff's unsworn statement, they do not go beyond the wide latitude permitted to counsel in closing arguments.

**{¶ 272}** Thus, we reject Knuff's 11th proposition of law.

**P. Proposition of Law No. XIV: Ineffective Assistance of Counsel**

**{¶ 273}** In his 14th proposition of law, Knuff contends that his trial counsel rendered ineffective assistance, resulting in prejudice to Knuff in the guilt phase and the penalty phase. To establish ineffective assistance of counsel, Knuff must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142-143, 538 N.E.2d 373 (1989).

### *1. Guilt Phase*

#### *a. Failure to request defense experts*

**{¶ 274}** Knuff first contends that his counsel were ineffective because they did not request a defense expert in blood-spatter analysis or crime-scene analysis.

**{¶ 275}** "[D]ebatable trial tactics do not establish ineffective assistance of counsel." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45. Trial counsel's failure to request an expert is a debatable trial tactic that does not amount to ineffective assistance. *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing *State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987); *see also State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97-99 (counsel's failure to request funds for experts was not ineffective assistance, because need for experts was purely speculative and counsel's choice to rely on cross-examination of prosecution's expert was a legitimate tactical decision). And Knuff makes only a bare assertion of prejudice. Thus, Knuff's ineffective-assistance-of-counsel claim fails on this issue.

### b. Failure to object to juror misconduct

{¶ 276} The next basis for Knuff's ineffective-assistance-of-counsel claim is his trial counsel's failure to object to a juror's continued service following alleged juror misconduct.

{¶ 277} After the state's guilt-phase closing arguments, the trial court recessed for lunch. A police officer who had testified in the case advised the court that a juror—later identified as juror No. 11—had approached him during the lunch break and expressed a desire to talk to him after the trial was over. The trial court proceeded to determine the circumstances of the communication, its impact on the juror, and whether it was prejudicial to Knuff's receiving a fair trial. *See Remmer v. United States*, 347 U.S. 227, 229-230, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (a trial court advised of potential juror misconduct should "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial"). In the presence of counsel for both parties, the court questioned the juror, who admitted to initiating the communication. The juror told the court that he wanted to talk to the officer about "[h]ow they did the investigation and that kind of stuff." When the court asked the juror whether the juror had formed an opinion about the defendant's guilt, juror No. 11 replied, "I'm not going to form a final opinion until I've heard what the defense has to say." The court then invited counsel for both parties to question juror No. 11; they declined to ask any questions.

{¶ 278} After an off-the-record discussion, the trial court stated:

> [A]fter speaking to counsel with regards to this particular juror, we have agreed that this was an innocuous remark and he did not formulate an opinion as * * * to this case and that he has been following the Court's instruction as he indicated in the record previously.

Defense counsel agreed with the trial court's statement.

{¶ 279} Knuff contends that his counsel rendered ineffective assistance by not requesting that juror No. 11 be discharged. In his view, the juror's action "suggest[ed] that the juror had already formed an opinion favorable to the State." But the trial court inquired of the juror whether the juror had formed an opinion about Knuff's guilt. "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Such a hearing occurred here.

{¶ 280} Nothing in the record indicates that juror No. 11 formed an opinion about Knuff's guilt after initiating a conversation with one of the witnesses for the state during a lunch break. In fact, the trial court evidently found the juror credible when the juror stated the contrary during the juror-partiality hearing. Credibility determinations about juror bias are for the trial court, and "[a] trial court may rely upon a juror's testimony as a basis for finding that [the juror's] impartiality was not affected." *State v. Herring*, 94 Ohio St.3d 246, 259, 762 N.E.2d 940 (2002).

{¶ 281} Defense counsel's performance was not deficient for accepting the trial court's ruling in the juror-partiality hearing, especially considering that defense counsel agreed with the court that the incident was innocuous. And even if counsel had objected, juror No. 11 was unlikely to have been dismissed on this record. *See State v. Grant*, 67 Ohio St.3d 465, 480, 620 N.E.2d 50 (1993) (juror's asking testifying detective how he was feeling did not reach level of reversible misconduct).

### 2. Penalty Phase

#### a. Failure to introduce exhibits

{¶ 282} Knuff argues that defense counsel's performance was deficient during the penalty phase because they did not introduce four documents that were discussed during the direct examination of the defense's mitigation witnesses.

**{¶ 283}** The exhibits in question were used during the examination of Kim Tandy, an expert witness on the conditions in Ohio's juvenile-detention system, and Dr. John Fabian, a defense-retained psychologist who examined Knuff before trial. The exhibits are (1) a "final fact-finding report" from unrelated federal litigation documenting the operations of the Ohio Department of Youth Services ("ODYS"), (2) a 1988 report discussing problems at Buckeye Boys Ranch (an ODYS facility where Knuff had been confined), (3) an article suggesting alternatives to confining certain juvenile offenders, and (4) Dr. Fabian's expert report.

**{¶ 284}** The contents of these documents were presented and discussed extensively during the testimony of Tandy and Dr. Fabian, but defense counsel did not introduce them into evidence. Knuff contends that the documents "could have supplied critical information upon which the jurors or the trial court could have relied in balancing the aggravating and mitigating factors." But as indicated by Knuff's use of the word "could," his claim is speculative because the documents are not in the record.

**{¶ 285}** Knuff further contends that "[w]ithout an apparent strategic reason for failing to submit the exhibits * * *, it cannot be presumed that there was a strategic reason for withholding this mitigatory evidence from the jury's consideration and accordingly failure to submit the exhibits in mitigation fell below the line of reasonable practice." But the burden to demonstrate deficient performance by counsel is Knuff's, and he has not satisfied that burden.

#### b. Failure to request merger

**{¶ 286}** As discussed in relation to Knuff's 12th proposition of law, his counsel's decision not to request merger of aggravating specifications was not prejudicial.

**{¶ 287}** We therefore reject Knuff's 14th proposition of law.

### Q. Proposition of Law No. XX: Cumulative Error

{¶ 288} In his 20th proposition of law, Knuff asserts that the errors at his trial and in his sentencing were cumulatively prejudicial and therefore denied him a fair trial. Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.

{¶ 289} We have found that the trial court did make errors in this case. But "errors 'cannot become prejudicial by sheer weight of numbers.' " *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.2d 508, ¶ 322, quoting *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996).

{¶ 290} The ambiguous reference to a polygraph examination (see proposition of law No. III) did not deny Knuff a fair trial. Nor did Stoner's improper opinion testimony (see proposition of law No. IV). Likewise, the instructional error identified in proposition of law No. XVII had no effect on the outcome of the case. The trial court's erroneous failure to merge specifications (see proposition of law No. XII) is cured by this court's independent sentence review. And the few instances of prosecutorial misconduct identified in proposition of law No. XI had no impact on the outcome of the trial.

{¶ 291} Knuff makes no attempt to show how these individually harmless errors when combined denied him a fair trial. Because he "offers no further analysis, this proposition lacks substance." *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103. We reject Knuff's 20th proposition of law.

### R. Proposition of Law No. XIII: Sentencing Opinion

{¶ 292} Knuff argues in his 13th proposition of law that errors in the trial court's sentencing opinion require that we remand this matter for a new mitigation

hearing or for the trial court to perform a proper sentencing analysis. However, Knuff has failed to demonstrate that the court erred in its sentencing opinion. Moreover, this court's independent review is sufficient to cure any errors in the trial court's sentencing opinion. *See, e.g.*, *State v. Garrett*, 171 Ohio St.3d 139, 2022-Ohio-4218, 216 N.E.3d 569, ¶ 267.

### 1. Incorrectly Weighing Mitigation Evidence

{¶ 293} Knuff contends that the trial court "failed to consider the cumulative weight of the mitigating evidence." A trial court must weigh proffered mitigating factors collectively against the aggravating circumstances. *See State v. Bays*, 87 Ohio St.3d 15, 30, 716 N.E.2d 1126 (1999). Knuff has not pointed to anything in the sentencing opinion that suggests the trial court failed to do so here.

### 2. "Unreasonably Discounting" Mitigation Evidence

{¶ 294} Next, Knuff claims that the trial court "discounted or gave too little weight to" his mitigating factors, including his expressions of sympathy for the victims' families. Although "a court may not refuse to consider relevant mitigating evidence," a court is not prohibited from "considering mitigating evidence and determining that it deserves no weight." *State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 59. "The weight to be given mitigating factors 'is necessarily an individual decision by the fact finder.' * * * It is subject to correction by means of independent appellate reweighing and is not a matter of law." *Id.* at ¶ 62, quoting *State v. Richey*, 64 Ohio St.3d 353, 369-370, 595 N.E.2d 915 (1992).

{¶ 295} Knuff also argues that the trial court refused to give weight to his proclamation of innocence. But residual doubt of guilt is not a mitigating factor. *State v. McGuire*, 80 Ohio St.3d 390, 402-403, 686 N.E.2d 1112 (1997). Knuff has not demonstrated that the trial court improperly weighed the mitigating factors.

### 3. Impermissible "Nexus" Requirement

{¶ 296} Knuff protests that the trial court impermissibly required a nexus between the asserted mitigating factors and the crimes. The trial court noted that Dr. Fabian, the defense's expert witness in psychology, had diagnosed Knuff with several mental disorders. In discussing the weight to be assigned to these diagnoses, the trial court noted the lack of evidence that any of them contributed to Knuff's actions.

{¶ 297} "[A] sentencer may not refuse to *consider* mitigating evidence on the ground that no connection exists between that evidence and the murder for which the defendant is being sentenced." (Emphasis sic.) *State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998, 78 N.E.3d 851, ¶ 68, citing *Smith v. Texas*, 543 U.S. 37, 45, 48, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004). But "[w]hether mitigating factors help to explain the murder is obviously relevant to the weight of those factors and may be considered by the sentencer in assigning weight to them." *Id.* at ¶ 70.

{¶ 298} The trial court's sentencing opinion adheres to these principles. Nothing in the opinion indicates that the trial court ignored or refused to consider any of Knuff's proffered mitigating factors on the ground that no connection existed between the proffered mitigation and the murders. In fact, the sentencing opinion shows that the trial court not only considered each of the mitigating factors in question but assigned weight (albeit little) to each. Thus, Knuff's claim lacks merit, and we reject it.

### 4. Admitting Irrelevant Evidence

{¶ 299} Finally, Knuff complains that the trial court admitted irrelevant evidence concerning his preparations to escape from jail. We resolved this issue above in connection with Knuff's 16th proposition of law. Further, as Knuff acknowledges, the trial court stated that this evidence "ha[d] not factored into the Court's independent analysis."

{¶ 300} We conclude that Knuff's 13th proposition of law lacks merit, and we reject it.

### S. Proposition of Law Nos. XV, XXI, XXIII, and XXIV: Settled Issues

#### 1. Penalty-Phase Jury Instructions

{¶ 301} In his 15th proposition of law, Knuff contends that the trial court should have instructed the jury to consider mercy and residual doubt as mitigating factors. But this court has long rejected this argument. *See, e.g.*, *Garrett*, 171 Ohio St.3d 139, 2022-Ohio-4218, 216 N.E.3d 569, at ¶ 236-238 (mercy); *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 225 (residual doubt).

#### 2. Trial Court's Proportionality Review

{¶ 302} In his 21st proposition of law, Knuff contends that the trial court should have evaluated his death sentences for proportionality compared to sentences in other aggravated-murder cases with death specifications. However, as Knuff acknowledges, this court has rejected the claim that a *trial* court is required to perform proportionality review. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 188; *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 211.

#### 3. Constitutionality of the Death Penalty

{¶ 303} In his 23rd proposition of law, Knuff raises several arguments against the constitutionality of the death penalty and the statutes governing its imposition. This court has already rejected similar arguments, *see generally State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 109-120; *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 85-90, and we decline to revisit our position on the issue here.

#### 4. Lethal Injection

{¶ 304} In his 24th proposition of law, Knuff contends that lethal injection as administered by the state of Ohio violates the Eighth Amendment to the United States Constitution's stricture against cruel and unusual punishment because Ohio's

three-drug execution protocol creates a sure or likely risk of inflicting severe pain and suffering.[6]  Knuff further asserts that the state's "history of botched executions" means that Ohio "never will" be able to carry out a constitutionally acceptable execution.

**{¶ 305}** We reject Knuff's Eighth Amendment claims because they "rely on [facts] outside the record [and therefore] are 'not appropriately considered on direct appeal.' "  *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 71, quoting *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000); *see also State v. Drain*, 170 Ohio St.3d 107, 2022-Ohio-3697, 209 N.E.3d 621, ¶ 143.

**{¶ 306}** We summarily reject Knuff's 15th, 21st, 23rd, and 24th propositions of law.  *See State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus ("When issues of law in capital cases have been considered and decided by this court and are raised anew in a subsequent capital case, it is proper to summarily dispose of such issues in the subsequent case"); *State v. Spisak*, 36 Ohio St.3d 80, 82, 521 N.E.2d 800 (1988).

### T.  Proposition of Law No. XIX: Court Costs

**{¶ 307}** During the sentencing hearing, the trial court stated that court costs were waived.  However, the trial court, in its final judgment entry, imposed court costs on Knuff.  In his 19th proposition of law, Knuff contends that the trial court, by imposing costs in the entry after stating its decision not to do so, denied him due process of law.

**{¶ 308}** The state concedes that the trial court erred when it imposed court costs against Knuff and suggests that the appropriate remedy is a remand for the limited purpose of allowing the trial court to correct its erroneous entry by means of a nunc pro tunc entry.  Such an entry would not be a new final order from which

---

6. Ohio has three different protocols available for lethal injection, but Knuff's argument is directed at only the three-drug execution protocol.

a new appeal could be taken. *See State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.3d 142, paragraph two of the syllabus and ¶ 18-20 (nunc pro tunc judgment entry correcting clerical error in final judgment entry is not new final order from which new appeal may be taken). Nor would a remand for this limited purpose allow Knuff to reopen the penalty phase or submit further evidence in mitigation. *See generally State v. Goff*, 154 Ohio St.3d 218, 2018-Ohio-3763, 113 N.E.3d 490, ¶ 20-23.

**{¶ 309}** In light of the state's concession, we adopt Knuff's 19th proposition of law and remand the case to the trial court for the limited purpose of correcting the imposition of court costs against Knuff in its final judgment entry.

### U. Proposition of Law No. XXII: Independent Sentence Review

**{¶ 310}** We may affirm a death sentence "only if * * * [we are] persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case," R.C. 2929.05(A), beyond a reasonable doubt, R.C. 2929.03(D)(1). In his 22nd proposition of law, Knuff contends that on independent review, this court should find that the aggravating circumstances do not outweigh the mitigating factors. He asks us to vacate his death sentences and impose sentences of life without parole for the murders of Mann and Capobianco.

#### 1. Aggravating Circumstances

**{¶ 311}** As discussed in relation to Knuff's 12th proposition of law, the kidnapping specifications should be merged with the aggravated-burglary specifications, leaving two death specifications: course of conduct and aggravated burglary. Knuff's convictions on these specifications are supported by the evidence.

**{¶ 312}** With respect to each aggravated-murder count, Knuff was convicted of a specification under R.C. 2929.04(A)(5): "[T]he offense at bar was

part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."

{¶ 313} The evidence supports Knuff's convictions for this aggravating specification. First, Capobianco was stabbed at least 5 times; Mann, at least 13. And they were stabbed in vital areas of the body. From this, the jury could infer that both killings were purposeful.

{¶ 314} Second, the evidence establishes that both murders were part of a single course of conduct. A course of conduct under R.C. 2929.04(A)(5) requires some connection between the murders. *Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, at syllabus. Specific examples of "factual link[s]" that may show a course of conduct include "time, location, murder weapon, or cause of death." *Id.* at ¶ 52. Here, the two murders were committed at the same time and place, and both were committed with knives. Thus, the evidence supports the jury's finding that they were part of a single course of conduct. *See Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 193.

{¶ 315} Additionally, with respect to each aggravated-murder count, Knuff was convicted under R.C. 2929.04(A)(7) of committing murder as the principal offender while committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary. The evidence supports this specification.

{¶ 316} Aggravated burglary, R.C. 2911.11(A)(1), consists of trespassing by force, stealth, or deception in an occupied structure with the purpose to commit a criminal offense while possessing a "deadly weapon or dangerous ordnance" (defined in R.C. 2923.11) when another person (other than an accomplice) is present therein.

{¶ 317} The term "occupied structure" includes "any house * * * in which at the [relevant] time any person is present." R.C. 2929.01(C). The house at 6209

Nelwood Road was an "occupied structure" when the murders occurred because Mann and Capobianco were present in the home.

{¶ 318} As we already explained when rejecting Knuff's 18th proposition of law, Knuff was trespassing inside the home at 6209 Nelwood Road when he committed the murders of Mann and Capobianco even though he had Mann's permission to be there, because the jury could find that Knuff's permission had been revoked once he began assaulting Mann and Capobianco.

{¶ 319} Finally, Knuff's purpose to commit a criminal offense and his possession of a deadly weapon are shown by his infliction of multiple stab wounds on each of the victims.

### 2. Mitigating Factors

{¶ 320} Against the two aggravating circumstances, we must weigh the mitigating factors to determine whether the former outweigh the latter beyond a reasonable doubt. R.C. 2929.05(A) and 2929.03(D)(1).

### a. Statutory mitigating factors, R.C. 2929.04(B)(1) through (6)

{¶ 321} The mitigating factors set forth in R.C. 2929.04(B)(1) through (6) are inapplicable. The evidence does not support a finding that the victims "induced or facilitated" the offenses, R.C. 2929.04(B)(1). Despite Knuff's self-defense claim, the evidence does not support a finding that Knuff acted "under duress, coercion, or strong provocation," R.C. 2929.04(B)(2). Although Knuff has been diagnosed with mental disorders, none is severe, and no evidence was produced indicating that any of them deprived him of "substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law," R.C. 2929.04(B)(3). Knuff, who was born in August 1974, was 42 years old when he committed the murders; hence, "youth of the offender," R.C. 2929.04(B)(4), is inapplicable. The record indicates that Knuff does not "lack * * * a significant history of prior criminal convictions and delinquency adjudications,"

R.C. 2929.04(B)(5). Finally, Knuff was the principal offender, so the degree-of-participation mitigating factor, R.C. 2929.04(B)(6), is absent.

*b. Nature and circumstances of the offenses*

{¶ 322} Knuff offers no argument about this factor, focusing instead on other factors such as his upbringing, mental health, and substance abuse. We find that the nature and circumstances of the aggravated murders offer nothing in mitigation.

*c. History, character, background, and other factors*

{¶ 323} In the penalty phase, Knuff presented three witnesses: James F. Crates, a mitigation specialist; Dr. Fabian, a board-certified forensic and clinical psychologist and a neuropsychologist; and Kim Tandy, the former director of the Children's Law Center, who testified about the historical conditions in ODYS institutions. (Knuff was confined at Buckeye Boys Ranch, an ODYS institution, in 1988.) Knuff's sister, Melissa Walters, testified during the guilt phase of the trial (but not the penalty phase); her testimony included background information about Knuff's childhood. Finally, Knuff gave an unsworn statement.

{¶ 324} Crates testified that he had tried to interview Knuff's relatives but that Knuff "did not have a significant number of people closely associated with him." Knuff's mother, Bonnie, died in 2014. James Simons, who lived with Bonnie during Knuff's adolescence, died in 2017, and Crates was unable to interview him before he died. Knuff's maternal grandparents are also dead. His biological father, Thomas Sr., has lived out of state since Knuff was a child; the two are not in touch with each other, and Crates was unable to contact him. Knuff's son Tommy refused to be interviewed. Crates testified that he had had "a number of interviews" with Walters. He explained that Knuff and Walters are estranged but that Walters had been "very informative" and had a "good recollection of family history." Crates also reviewed numerous records, including educational records, records from the ODYS, and Knuff's prison records.

{¶ 325} Dr. Fabian interviewed Knuff four times.  He also spoke twice with Walters and once with Tommy but was unable to contact Knuff's father.  Additionally, Dr. Fabian reviewed the information and records that Crates had obtained.

{¶ 326} Dr. Fabian described Knuff's evaluation as "challenging" and "difficult" because Knuff is "a closed door."  Knuff would not share much emotion and tended to minimize, deny, or refuse to discuss how things affected him.  He also tended to minimize or lack insight into his own prior decisions.

i. Knuff's dysfunctional family

{¶ 327} Knuff was born in 1974 to Thomas Sr. and Bonnie.  Walters testified that she had fond memories of their childhood.  The children were fed, cared for, and loved; Walters felt she had everything she needed as a child.

{¶ 328} Knuff's father had alcohol and drug problems, and Crates described Knuff's father as "ineffectual and unattentive to" the needs of his children.  Crates testified that he learned that when Knuff was six years old, his father put "acid" into a cup of tea that was meant for Knuff's mother but Knuff got hold of the cup and drank the tea.  Knuff also relayed this history in his unsworn statement.  According to Knuff, his father also taught him how to de-seed marijuana when he was five or six years old.

{¶ 329} In his unsworn statement, Knuff recounted cruel jokes and punishments that his father subjected him to.  For example, he said his father told him that his pet rabbit's feces pellets were candy and let him eat some.  Knuff stated, "He told me my testicles were gum balls and my mom caught me with scissors ready to cut my sack open."  When Knuff started playing with matches at age six, his father lit the stove and pretended he was going to stick Knuff's hand in the flame.  When he was seven, his parents took him to a police station and had him "booked in" as a "fire bug."  Additionally, records that Dr. Fabian reviewed state

that Knuff's grandfather chased Knuff around the house with an ax when Knuff was young.

{¶ 330} Knuff's parents divorced in 1981, when he was six or seven years old. Thomas Sr. moved to Florida (and later to Hawaii), so Knuff saw him only once or twice between the ages of seven and 16. Knuff and Walters lived with their maternal grandparents for a time after the divorce. Walters told Dr. Fabian that she and Knuff had had a good relationship with their grandparents, and she testified that their grandparents had been generous and played an active role in their lives. However, Knuff's grandfather had also had an alcohol problem.

{¶ 331} Bonnie had a college degree and was employed by a law firm and the Cuyahoga County schools. Mental-health records reviewed by Crates indicate that Bonnie had "used substances," but Knuff told Dr. Fabian that his mother never had any alcohol or drug problems. However, Dr. Fabian reviewed records that indicated that as an adolescent, Knuff had said otherwise, leaving Dr. Fabian to "wonder what the truth was."

{¶ 332} In 1984, Bonnie began living with Simons, whom Knuff referred to as his "stepdad." Crates testified that Walters had described Simons as being "a drunken, emotionally and physically abusive presence" in the household. At age 13, Knuff reported to the hospital where he was being treated for chemical dependency that he had been physically abused by and had seen his mother be physically abused by Simons. When she was interviewed by Dr. Fabian, Walters also recounted beatings that Simons had inflicted on Bonnie and Knuff, and Knuff relayed similar events in his unsworn statement.

{¶ 333} However, Knuff also had good memories of Simons, and their relationship improved after Simons reduced his drinking. Knuff liked hanging out with Simons partly because Simons let him smoke and drink beer beginning at the age of ten.

{¶ 334} At age 16, Knuff went to live with his father in Hawaii, but this lasted only about 30 days. Knuff admitted to Dr. Fabian that he had problems with his own "rebellious" attitude and that his father was not really interested "in being a father." When Knuff was scheduled to fly back to Ohio, he and his father shared some marijuana as a farewell gesture.

{¶ 335} Dr. Fabian learned from Walters that Bonnie had felt bad that Knuff lacked a consistent father figure. Walters reported that as a result, Bonnie was permissive and "lax in discipline" with Knuff. Dr. Fabian considered Bonnie's permissiveness "detrimental overall to [Knuff's] development."

{¶ 336} Knuff graduated from high school in 1993. Dr. Fabian reviewed Knuff's school records, finding that he had "performed adequately at times" but had had significant behavioral problems, including cutting classes with his friends. Dr. Fabian thought Knuff's truancy was related to his chemical dependency.

{¶ 337} Dr. Fabian characterized Knuff's family as "markedly dysfunctional." In Dr. Fabian's opinion, being chased with an ax, accidentally ingesting acid, smoking marijuana at age ten, being fooled by a parent into eating rabbit feces, and being given cigarettes and beer by a stepparent while in the fifth grade are not normal. He described Knuff's broken home and his mother's choice of "dysfunctional men," including the abusive Simons, as "early traumatic events" in Knuff's life.

## ii. Knuff's childhood drug use

{¶ 338} Knuff was using marijuana by age ten and crack cocaine by approximately age 18. By age 12 or 13, Knuff was seeking treatment for his drug habit. ADDS, an outpatient mental-health facility, declined to admit Knuff on the ground that his family was "too sick to benefit from their program" because they were "entrenched in their patterns of rescuing, blaming, enabling, inability to detach, family secrets, and need to control the course of treatment." According to

ADDS, Knuff needed long-term treatment and intensive services, not outpatient care.

**{¶ 339}** Dr. Fabian testified that the earlier a person begins using drugs, the worse it affects his outcomes because early drug use increases a person's likelihood of committing juvenile offenses, having academic problems, and experiencing "interpersonal deficits with other people." Thus, Knuff's drug use around age ten was "not a good sign," according to Dr. Fabian.

### iii. Knuff's ODYS confinement

**{¶ 340}** In 1988, Knuff was suspended from school with a recommendation of expulsion. His juvenile-court file states that he was "out of control" and had Valium in his school locker. In March 1988, Knuff was placed in ODYS custody and sent to Buckeye Boys Ranch until December 1988.

**{¶ 341}** In his unsworn statement, Knuff said that he was beaten up by five or six larger, older juveniles on his first night in ODYS custody. Walters told Dr. Fabian that Knuff was "different" after being in juvenile detention. She said that Knuff reported having been sexually assaulted while at Buckeye Boys Ranch. But Dr. Fabian testified that Knuff had denied that repeatedly when asked. Although he had concerns about the possibility, Dr. Fabian was unable to conclude that Knuff had been sexually abused.

**{¶ 342}** Tandy testified about the conditions in ODYS facilities. Beginning in 2003, under Tandy's directorship, the Children's Law Center investigated ODYS and initiated litigation over conditions of confinement. She testified that ODYS institutions were run similarly to adult prisons and that guards were not trained to work with children and services were not designed for children. She explained that the overcrowded institutions suffered from gangs and a "culture of violence."

**{¶ 343}** Tandy did not interview Knuff, did not offer opinions about his specific experiences, and lacked extensive knowledge of conditions in ODYS institutions during Knuff's 1988 confinement. Buckeye Boys Ranch had closed by

the time of the litigation discussed by Tandy. But having read a 1988 report on Buckeye Boys Ranch, Tandy noted similarities between conditions in the early 2000s when she conducted her investigations and those in 1988 when Knuff was confined. And she said that in some ways, conditions in 1988 were worse.

{¶ 344} Tandy testified that Buckeye Boys Ranch had not been designed to serve as a juvenile-detention facility. She said that in 1988, the facility was badly overcrowded—150 to 190 percent over capacity based on national standards—with 50 beds to each unit, which was "way too many" in her opinion. Buckeye Boys Ranch provided little in the way of assessing juvenile offenders who were confined there, which is now considered necessary to both treating and classifying juvenile offenders. Classification was based almost exclusively on a child's age and offense.

{¶ 345} The 1988 report did not address the quality of mental-health treatment available at Buckeye Boys Ranch, and Tandy was unable to opine about that. However, she testified that based on the minimal services available in other juvenile-detention facilities at the time, she questioned whether adequate treatment would have been available to Knuff.

{¶ 346} Crates testified that when Knuff was released from ODYS custody, he returned to the same peer group he had left and repeated the same behaviors.

### iv. Knuff's mental disorders

{¶ 347} Knuff has been diagnosed with and treated for mild to moderate depression over the years. Dr. Fabian found no evidence that Knuff is bipolar or has any other severe mental illness. Evidence was presented that Knuff has persistent mild depression, posttraumatic stress disorder ("PTSD"), and antisocial personality disorder, which Dr. Fabian described as "a criminal personality, someone who has problems with following the law." Dr. Fabian also diagnosed Knuff with a history of chemical dependency (alcohol, cannabis, and cocaine).

{¶ 348} According to Dr. Fabian, Knuff's records contained some evidence of childhood attention-deficit-and-hyperactivity disorder ("ADHD"), and his own examination of Knuff also revealed some symptoms of ADHD, but he did not find enough evidence to make a diagnosis. Dr. Fabian noted that about half of the children who are diagnosed with ADHD grow out of it.

{¶ 349} Dr. Fabian's neuropsychological testing indicated that Knuff's attention, memory, language skills, visuospatial skills, and abstract-reasoning ability are average. Knuff's IQ is 101, which Dr. Fabian described as being in the average range. Dr. Fabian saw no "significant evidence of brain dysfunction or brain damage," and Crates testified that Knuff's school records do not raise any significant question about his cognitive functioning. Knuff graduated from high school. According to Crates, Knuff also earned a GED while in prison. (The record does not explain how a high-school graduate could also earn a GED.)

v. Knuff's unsworn statement

{¶ 350} Most of Knuff's unsworn statement was dedicated to reiterating his claim of innocence. Knuff also said in his unsworn statement that he was sorry for leaving the bodies in the house and denying the families the opportunity to have a "proper funeral" for Mann and Capobianco. And while he continued to deny having committed the murders, he did admit that he felt guilty about having created the situation between Mann and Capobianco.

### 3. Sentence Evaluation

{¶ 351} Knuff grew up in a dysfunctional family, experienced early traumas in the form of a broken home and domestic violence, and had had, at best, a rocky relationship with his principal father figure, James Simons. He was exposed to drugs early in life and began abusing them himself at a young age. His family was a stumbling block to his efforts to obtain treatment for his substance use. Yet he also had his mother's love and was provided for by his mother and grandparents.

**{¶ 352}** We have seldom given much weight to a defendant's unstable or troubled childhood, even childhoods much worse than Knuff's. *See, e.g.*, *State v. Cooey*, 46 Ohio St.3d 20, 41, 544 N.E.2d 895 (1989); *State v. Campbell*, 95 Ohio St.3d 48, 51-53, 765 N.E.2d 334 (2002); *Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, at ¶ 241. *But see Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 193-195, 208, 216 (imposing a life sentence after independent review); *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 137-140 (same); *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 101-106 (same).

**{¶ 353}** Knuff murdered Mann and Capobianco when he was 42 years old. Thus, he had reached " 'an age when * * * maturity could have intervened' and 'had clearly made life choices as an adult before committing [these] murder[s],' " (ellipsis sic and brackets added) *Campbell* at 53, quoting *State v. Murphy*, 65 Ohio St.3d 554, 588, 605 N.E.2d 884 (1992) (Moyer, C.J., dissenting). He had "had considerable time to distance himself from his childhood and allow other factors to assert themselves in his personality and his behavior," *id*. Therefore, Knuff's childhood deserves very little weight in mitigation.

**{¶ 354}** Knuff's mental disorders—mild to moderate depression, PTSD, antisocial-personality disorder, and chemical dependency—are relevant mitigating factors that deserve modest weight under R.C. 2929.04(B)(7). *See State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 120 (depression, substance abuse, and antisocial- or borderline-personality disorder are relevant mitigating factors); *State v. Stojetz*, 84 Ohio St.3d 452, 471-472, 705 N.E.2d 329 (1999) (PTSD deserved "very little weight"; PTSD combined with paranoid-schizoid personality with antisocial tendencies "entitled to only modest mitigating weight"); *State v. Biros*, 78 Ohio St.3d 426, 457, 678 N.E.2d 891 (1997) (personality disorder, alcohol dependence, and depression received "very little" weight).

**{¶ 355}** Knuff said in his unsworn statement that he was sorry for leaving Mann's and Capobianco's bodies in the house and denying the families the opportunity to have a "proper funeral" for the victims. And while he continued to deny having committed aggravated murder, he did admit that he felt guilty about creating the situation between Mann and Capobianco. This deserves little or no weight in mitigation. A defendant's denials of guilt "negate any mitigating weight that we might otherwise give to his expressions of sorrow." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.3d 955, ¶ 205; *see also Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, at ¶ 292.

**{¶ 356}** Overall, Knuff's mitigating factors are unimpressive and are outweighed by the aggravating circumstances. Though the felony-murder aggravating circumstance does not merit much weight on the facts of this case, "the commission of multiple murders is a grave aggravating circumstance that carries great weight," *State v. Lawson*, 165 Ohio St.3d 445, 2021-Ohio-3566, 179 N.E.3d 1216, ¶ 183, citing *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 91. *Accord Garrett*, 171 Ohio St.3d 139, 2022-Ohio-4218, 216 N.E.3d 569, at ¶ 340. In sum, we hold that the aggravating circumstances outweigh the mitigating factors in this case beyond a reasonable doubt.

### 4. Proportionality

**{¶ 357}** Finally, we must determine whether the death sentences imposed in this case are proportionate to sentences that we have upheld in similar cases. We have upheld death sentences in cases involving double murders combined with aggravated burglary. *See State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 144; *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 163. Indeed, we have also upheld death sentences in double-murder cases with only a course-of-conduct specification. *See State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 161; *State v. Awkal*, 76 Ohio St.3d 324, 338, 667 N.E.2d 960 (1996).

{¶ 358} The cases in which we have reversed death sentences after independent review are not comparable to Knuff's case. *Graham*, *Tenace*, and *Johnson* each involved only one murder victim. The defendants in *Graham* and *Johnson* were 19 years old when they committed the murder. *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 207; *Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 133. The defendants in *Tenace* and *Johnson* had childhoods far worse than Knuff's. *See Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, at ¶ 70-90, 101-103; *Johnson* at ¶ 111-115, 131-132. And the defendant in *Graham* presented evidence to support the assertion that he would not have committed the murder but for his drug addiction, *Graham* at ¶ 199. None of these cases support a reversal of the death sentences imposed under the circumstances here.

{¶ 359} In all, we conclude that the death sentences imposed in this case are proportionate to sentences imposed in similar cases.

### III. CONCLUSION

{¶ 360} For the foregoing reasons, we affirm Knuff's convictions and death sentences. We remand the case to the trial court for the limited purpose of correcting the judgment entry's imposition of court costs against Knuff.

Judgment affirmed

and cause remanded for limited purpose.

KENNEDY, C.J., and FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., concurs, with an opinion joined by BRUNNER, J.

———————————

**DONNELLY, J., concurring.**

{¶ 361} Respectfully, I disagree with the majority that death specifications for felony murder predicated on aggravated burglary and kidnapping were appropriate in the case against appellant, Thomas E. Knuff Jr. Although the majority merges the two felony-murder death specifications, I believe that neither

one should have been charged in the first place. I otherwise join the majority's opinion and I concur in the judgment.

{¶ 362} I see no problem with the state's pursuing aggravated-burglary charges or death specifications premised on aggravated burglary against a defendant when the timing of the offenses or other circumstances suggest that the defendant sought permission to enter the premises for the purpose of committing murder or other felonies. The cases the majority cites in support of upholding Knuff's convictions for aggravated burglary and felony-murder specifications, *see* majority opinion, ¶ 202, involve such timing and circumstances. *See State v. Holloway*, 38 Ohio St.3d 239, 527 N.E.2d 831 (1988) (the defendant was granted entry by the resident, who had never met the defendant before that evening, and he killed the resident less than 90 minutes later); *State v. Steffen*, 31 Ohio St.3d 111, 112, 509 N.E.2d 383 (1987) (the defendant was presumably granted entry by the resident as a door-to-door salesman, and he killed the resident soon after gaining entry); *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 16, 18-19 (the defendant was presumably granted entry as a friend of the resident, and he killed the resident and her two young children within about an hour of his entry). But such circumstances are not present in this case. Knuff did not gain permission for mere temporary entry onto the premises where he murdered John Mann and Regina Capobianco, let alone gain permission for entry onto the premises by deception for the purpose of committing the murders; Knuff, Mann, and Capobianco all resided on the premises.

{¶ 363} Critics have long lamented the expansion of the meaning of "burglary" from a specifically defined common-law crime to "one of the most generalized forms of crime, developed by judicial accretion and legislative revision." Wright, *Statutory Burglary—the Magic of Four Walls and a Roof*, 100 U.Pa.L.Rev. 411 (1951). If it is possible under Ohio law to commit burglary on the very premises where one resides, then we have stretched the concept of burglary to

its outermost limit, or maybe beyond. But even assuming that Knuff's actions meet the legal definition of "aggravated burglary" in this case, *see* R.C. 2911.11, his actions were an inappropriate basis on which to seek the death penalty. And although there is a stronger argument that Knuff's actions technically satisfied the legal definition of "kidnapping," *see* R.C. 2905.01, his actions were likewise an inappropriate basis on which to seek the death penalty.

**{¶ 364}** I agree with former Justice Paul Pfeifer's view that "the felony-murder rule is often inappropriate for determining which murderers are death-worthy." *State v. Twyford*, 94 Ohio St.3d 340, 372, 763 N.E.2d 122 (2002) (Pfeifer, J., dissenting). Thanks to the breadth of Ohio's felony-murder death-penalty specification, "[a]ny murder that occurs in conjunction with a felony such as robbery [or burglary or kidnapping] is eligible." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 221 (Donnelly, J., concurring). And thanks to our own "judicial accretion," Wright at 411, burglary can be charged in conjunction with almost any murder that occurs within four walls, and kidnapping can be charged in conjunction with almost any murder in which death was not instantaneous. As a result, Ohio's felony-murder specification does not " 'genuinely narrow the class of persons eligible for the death penalty,' " nor does it justify executing a particular defendant who has been found guilty of murder. *Graham* at ¶ 221 (Donnelly, J., concurring), quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The least we could do to avoid the arbitrary and capricious imposition of the death penalty would be to refuse to consider a predicate offense as an aggravating factor in favor of the death penalty when that offense is wholly incidental to the murder. *Twyford* at 373 (Pfeifer, J., dissenting).

{¶ 365} Knuff did not commit any actions independent of his murdering Mann and Capobianco to satisfy the elements of aggravated burglary[7] or kidnapping.[8] Knuff could not have committed aggravated burglary without being a trespasser,[9] but he did not become a trespasser until he fatally attacked the victims. Knuff could not have committed kidnapping without restraining the victims, but he did not restrain the victims apart from fatally attacking them. Because Knuff's actions constituting aggravated burglary and kidnapping were wholly incidental to and inseparable from the murders, they should not have been a basis for charging him with felony-murder aggravating specifications under R.C. 2929.04(A)(7).

{¶ 366} Had the felony-murder specifications been the sole aggravating specifications underlying Knuff's aggravated-murder charges, I would be dissenting from the majority's judgment affirming the death sentence. However, I agree with Knuff's conviction for a course-of-conduct death specification under R.C. 2929.04(A)(5) for each count of aggravated murder, and I do not otherwise dispute the majority opinion's analysis. Accordingly, I join the majority opinion in part and I concur in the judgment.

BRUNNER, J., concurs in the foregoing opinion.

———————————

7. Knuff was charged with aggravated burglary in violation of R.C. 2911.11(A)(1), which provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another.

8. Knuff was charged with kidnapping in violation of R.C. 2905.01(A)(3), which prohibits moving a person or restraining the person's liberty "by force, threat, or deception," with the purpose "[t]o terrorize, or to inflict serious physical harm on the victim or another."

9. To satisfy the trespass element, Knuff had to "[k]nowingly enter or remain on the land or premises of another," "without privilege to do so." R.C. 2911.21(A)(1).

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Frank Romeo Zeleznikar and Katherine Mullin, Assistant Prosecuting Attorneys, for appellee.

Joseph V. Pagano; and Elizabeth R. Miller, Ohio Public Defender, and Rachel Troutman and Adam D. Vincent, Assistant Public Defenders, for appellant.

_____